**Albert ALLEN, Plaintiff–Appellant,**

v.

**MICHIGAN DEPARTMENT OF CORRECTIONS, Defendant– Appellee.**

**No. 97–1720.**

United States Court of Appeals, Sixth Circuit.

Submitted Aug. 7, 1998.

Decided Jan. 6, 1999.

Robert H. Golden (briefed), Golden & Kunz, Lathrup Village, Michigan, for Plaintiff–Appellant.

Patrick J. O'Brien, Asst. Atty. Gen. (briefed), John S. Mackey, Office of the Attorney General, Public Employment & Elections Division, Lansing, Michigan, for Defendant–Appellee.

Before: KEITH, BATCHELDER, and COLE, Circuit Judges.

COLE, J., delivered the opinion of the court, in which KEITH, J., joined. BATCHELDER, J. (pp. 413–418), delivered a separate opinion concurring in part and dissenting in part.

COLE, Circuit Judge.

Plaintiff–Appellant Albert Allen appeals the district court's grant of summary judgment in favor of Allen's employer, the Michigan Department of Corrections ("MDOC") on Allen's Title VII claims of racial discrimination, harassment and retaliation for engaging in protected activity. For the reasons that follow, we **AFFIRM** in part and **REVERSE** in part, and **REMAND** to the district court for further proceedings in accordance with this opinion.

## I.

Allen, who is African American, has been employed by MDOC in various capacities since 1985. Beginning in 1989, Allen complained of discriminatory conduct directed towards him by white supervisory personnel while Allen was employed on Cell Block Eight at Jackson Correctional Facility ("Block Eight"). Allen's complaints appear to have started when the three black officers working in Block Eight were transferred out of the block in September 1989 because "[i]t was not customary for black officers to work

on Cell Block 8." Allen filed a grievance objecting to his transfer and was reassigned to Block Eight. After reassignment, Allen was the only black officer on Block Eight.

Allen claims that as a result of filing a grievance regarding the transfer, he was subjected to "numerous acts of harassment, retaliation, and discrimination on account of his race." Allen's allegations can be summarized as follows:

12/28/89: A white officer used bolt cutters to cut the lock on Allen's locker. No investigation or disciplinary action took place.

1/8/90: Allen was disciplined by receiving a "counseling memorandum" for leaving a break box unsecured and a gate opened "when other white officers also had keys to the box and gate and could have been blamed for the occurrence but were not."

3/3/90: Allen successfully passed the examination for sergeant and was placed in the "first band" of persons passing the examination. However, Allen was never promoted to sergeant despite the fact that white employees in the "second band" were promoted.

10/9/90: Allen was told by Assistant Resident Unit Manager Hilton that "he was lazy like the rest of his people and that is why they are all in prison."

Late 1990/Early 1991: Resident Unit Manager Bailey was advised in writing to allow three white officers who had not passed the sergeant's examination and had less experience and seniority than Allen to assume the duties of "acting-sergeant" when a sergeant was not present on the shift.

6/27/91: Allen bid and obtained a job on Block Eight. Allen found a note among his possessions that said "Allen IV. Pull bid—if not, you will be looking for a job or die. Nigger out." The note was written on departmental forms, was signed "KKK" and had a picture drawn on it of a stick figure with a noose around its neck. MDOC investigated this incident by taking handwriting samples and interviewing employees, but the perpetrator was never discovered. Allen claims that MDOC should have fingerprinted the threatening note.

Late 1991: On several occasions, Allen's notations in the Block Eight sign-in log were improperly changed to reflect that Allen took longer than the allotted thirty-minutes for lunch. Allen received "counseling memoranda" for these incidents.

10/27/91: Allen was leaving work when told by his supervisor, Sergeant Madery, that he had to return to finish a report. Allen replied that he would finish it on his next work day. Madery then made the following comments to Allen: "I'm writing your black ass up," "Boy, I told you to get your black ass back into the block and finish your paper work" and "Allen you can't make sergeant because you won't play team ball." As a continuation of this incident, Madery told Allen that he was transferring him to an area in which he could be watched more closely because "[n]iggers can't be trusted." Allen reported Madery's statements to the shift commander.

4/8/93: Allen submitted a resume to MDOC for a sergeant position and was informed that he was not on the list of eligible individuals for the position of sergeant.

In general: Allen complains that he was constantly observed and followed by Madery, Bailey and Hilton, although non-black employees were not so followed.

Allen filed additional complaints regarding these incidents with the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission ("EEOC").

In 1994, Allen went on long-term disability leave because of stress; in addition, Allen now takes antidepressant medication and undergoes counseling, allegedly as a result of his employment conditions.

On January 23, 1996, the EEOC issued a "right to sue" letter to Allen. Thereafter, Allen filed a complaint in the United States District Court for the Eastern District of Michigan, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e *et seq.*, and Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2101 *et seq.* Specifically, Allen's complaint alleged racial discrimination, harassment, and retaliation for engaging in protected activities. On May 2, 1996, the district court dismissed Allen's state-law claims.

MDOC then filed a motion for summary judgment on Allen's Title VII claims, which the district court granted on June 10, 1997. The district court found that Allen: (1) failed to establish a prima facie case of race discrimination because he did not show that he applied for any promotions received by non-black employees; (2) failed to establish a prima facie case of harassment because he did not show that MDOC tolerated or condoned the conduct at issue; and (3) failed to establish a prima facie case of retaliation because he did not show that the defendants were aware of his protected activity or that there was a causal connection between the protected activity and the alleged adverse employment action. Accordingly, the district court entered judgment in favor of MDOC. This timely appeal followed.

## II.

■ We review de novo a district court's grant of summary judgment. *See City Management Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 250 (6th Cir.1994); *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir.1994). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a mo-

tion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)).

## III.

■ In this case, Allen raises three Title VII claims: (1) racial discrimination; (2) racial harassment; and (3) retaliation for engaging in protected activities. In general, a plaintiff in a Title VII action "has the burden of proving by a preponderance of the evidence a prima facie case." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). After proving the existence of a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant meets this burden, the plaintiff must then show that the defendant's articulated reason is a pretext for discrimination. *See id.* We therefore start by determining whether Allen has established a prima facie case with respect to each claim.

### A. Racial Discrimination

Allen claims that MDOC's failure to promote him to sergeant was based on racial discrimination. In support of that claim, Allen contends that non-black employees who had not passed the sergeant examination were promoted instead of Allen, who had passed the sergeant examination; in addition, Allen contends that because of his race, he was not permitted to assume the duties of "acting sergeant," nor was he on the list of employees eligible for promotion to sergeant. Allen also claims that he received disciplinary actions in the form of counseling memoranda because of his race, and that his supervisors referred to him using racial epithets and

monitored him more closely than they monitored non-black employees.

▇▇ In order to set forth a claim of racial discrimination, a plaintiff must show that he has suffered an adverse employment action; that is, he must establish that he has suffered a "materially adverse" change in the terms or conditions of employment because of the employer's actions. *See Kocsis v. Multi–Core Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (citation omitted). Despite the fact that the incidents cited by Allen reflect racial animus, these incidents did not, for the most part, result in a "materially adverse" change in Allen's employment status or in the terms and conditions of his employment. The exception to this is Allen's claim that MDOC failed to promote him based on his race.

▇▇ For purposes of Title VII, a failure to promote is an adverse employment action. *See Hale v. Cuyahoga County Welfare Dep't,* 891 F.2d 604, 606 (6th Cir.1989). In order to establish a prima facie claim of racial discrimination based on a failure to promote, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *See Betkerur v. Aultman Hosp. Ass'n,* 78 F.3d 1079, 1095 (6th Cir.1996); *Brown v. Tennessee,* 693 F.2d 600, 603 (6th Cir.1982).

▇▇ In the present case, although Allen, as an African American, established that he was a member of a protected class and that he was qualified for the position of sergeant, he failed to show that he was rejected in favor of another person who was not a member of his protected class. In his deposition testimony, Allen stated that he could name only one non-black person who was promoted to sergeant—Cerone—but admitted that he did not interview for the position of sergeant at the time that Cerone was promoted. Allen could not name any other individuals who were promoted to sergeant. Accordingly, Allen cannot establish a prima facie case of racial discrimination because there is no gen-

uine issue of material fact regarding whether Allen was denied a promotion while other similarly situated non-blacks received promotions. The district court correctly granted summary judgment to MDOC on Allen's claims of racial discrimination, and we therefore affirm that judgment.

## B. Racial Harassment

Allen alleges various acts of racial harassment by MDOC. These acts include the following: Allen's lock was cut off his locker; his notations in the log book were altered; he received unwarranted disciplinary action; he was monitored more closely than non-black employees; he was not promoted to sergeant; he was subjected to racial epithets and insults by supervisory personnel; and he received a threatening note signed by the "KKK." The district court found that Allen failed to establish a prima facie case of racial harassment because the incidents of which he complained were insufficient to form a hostile work environment claim and there was no evidence that MDOC tolerated or condoned the behavior. We disagree on both counts.

▇▇ In order to establish a hostile work environment claim, a plaintiff must show that the harassment consisted of "severe or pervasive conduct." *See Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, ——, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998) (citations omitted); *see also Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir.1988) (stating that a plaintiff must show "repeated slurs"). With respect to this requirement, we have stated that

> all that the victim of racial harassment need show is that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job.

*Davis,* 858 F.2d at 349.

▇▇ Several of Allen's allegations clearly constitute racial harassment. First, Allen was subjected to derogatory racial insults by two of his supervisors, Madery and Hilton, on separate occasions. Hilton told Allen that "he was lazy like the rest of his people and that is why they are all in prison." Madery

stated to Allen that "I'm writing your black ass up." Madery also commented to Allen that he was transferring him to an area in which he could be watched more closely because "[n]iggers can't be trusted." Bailey, another of Allen's supervisors, allegedly was informed by his supervisors not to allow Allen to serve as acting-sergeant when a sergeant was not present on the shift, although less experienced white officers were permitted to do so. Allen also points to the fact that his supervisors never investigated or disciplined the white officer caught removing the lock from Allen's locker with bolt cutters.

In addition, Allen claims that his supervisors treated him unfairly based upon his race on a continual, ongoing basis. In support of this statement, Allen claims that he, unlike white officers, was constantly observed and followed by Madery, Bailey and Hilton. Allen also claims that these supervisors monitored his work more closely than that of white officers. This allegation is supported by Madery's comment that Allen had to be watched more closely because "[n]iggers can't be trusted." Allen's other claims of ongoing harassment include the receipt of counseling memoranda from his supervisors when Allen was several minutes late returning from lunch which resulted, Allen claims, from falsifications of the log book.

Perhaps Allen's most disturbing evidence of racial harassment is the threatening letter he received telling him to "Pull bid—If not, you will be looking for a job or die. Nigger out." The note was signed by the "KKK" and contained a reference to lynching, a drawing of a stick figure with a noose around its neck. Although this event could not be directly attributed to Allen's supervisors, there is a least an inference that the supervisors condoned the action as the perpetrator(s) were never found. Moreover, the supervisors themselves could not be ruled out as the perpetrators, given their racially motivated insults directed at Allen. Allen eventually went on long-term disability leave as a result of stress.

These instances of harassment were neither isolated nor sporadic; we therefore conclude that Allen was subjected to a hostile work environment because these ongoing incidents created an unreasonably abusive or offensive work-related environment which adversely affected Allen's ability to do his job.

Our analysis does not stop here, however. We previously have stated that if a plaintiff can show that racially motivated conduct constituted a hostile work environment, he then must show that the employer "tolerated or condoned" the harassing conduct in order for the employer to be liable. See *Davis,* 858 F.2d at 349. In this case, the district court found that Allen did not establish that MDOC tolerated or condoned the harassing conduct; therefore, Allen did not set forth a prima facie case of racial harassment against MDOC. However, since the time of the district court's decision, the Supreme Court has modified the "tolerated or condoned" standard to allow the vicarious liability of employers in harassment cases. See *Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Although *Ellerth* and *Faragher* dealt with claims of sexual harassment, their reasoning is equally applicable to claims of racial harassment. See *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 156 F.3d 581, 593 (5th Cir.1998) (stating that "it appears that the Court [in *Ellerth* and *Faragher*] intended to apply these same agency principles to all vicarious liability inquiries under Title VII for acts of supervisors, including racial discrimination); *Wright–Simmons v. The City of Oklahoma City,* 155 F.3d 1264, 1270 (10th Cir.1998) (stating that "[a]lthough Burlington and Faragher involved sexual harassment, the principles established in those cases apply with equal force to this case of racial harassment"); *Wallin v. Minnesota Dep't of Corrections,* 153 F.3d 681, 687–88 (8th Cir.1998) (applying *Faragher* to an harassment claim under the ADA); *see also Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 834 (6th Cir.1996) (stating, pre-*Ellerth* and *Faragher,* that "[t]he elements and burden of proof are the same, regardless of the discrimination context in which the claim arises" (citation omitted)); *Harrison v. Metropolitan Gov't,* 80 F.3d 1107, 1118 (6th

Cir.) (stating, pre-*Ellerth* and *Faragher,* that "the elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment"), *cert. denied,* — U.S. ——, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996).

In *Ellerth* and *Faragher,* the Court discussed the vicarious liability of an employer for the actions of a supervisory employee. The Court stated in *Ellerth:*

> In order to accommodate the agency principles of vicarious liability for harm caus ed by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding in this case and in Faragher v. Boca Raton ... also decided today. **An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.** When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

—— U.S. at ——, 118 S.Ct. at 2270 (emphasis added).

■ In the present case, then, MDOC may be subject to vicarious liability for Allen's claims regarding the actions of its supervisory employees, subject to its ability to raise the above-mentioned affirmative defense. MDOC is entitled to the affirmative defense if Allen has failed to establish that he suffered a tangible employment action resulting from the hostile work environment. The Supreme Court defined "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at ——, 118 S.Ct. at 2268. As we have stated, Allen has not established a failure-to-promote claim, nor has he set forth any other claims of tangible employment actions; accordingly, MDOC may raise the affirmative defense. Because MDOC may be vicariously liable for the harassing actions of its supervisory employees, we reverse the district court's grant of summary judgment in favor of MDOC on Allen's harassment claims and remand to that court for a determination regarding MDOC's affirmative defense to liability.

### C. Retaliation

■ Allen claims that his supervisors retaliated against him because he filed grievances with the EEOC and the Michigan Civil Rights Commission. In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Harrison,* 80 F.3d at 1118 (citing *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987)).

■ Here, Allen clearly engaged in protected activity by filing various grievances against MDOC. The district court found, however, that Allen failed to establish that MDOC was aware of the exercise of his civil rights. Allen now argues that the district court should have inferred that MDOC was so aware.

Allen has not specifically alleged that MDOC or his immediate superiors were aware that he had filed various grievances; however, in Allen's deposition testimony, the following exchange took place:

Q. At that time how many civil rights complaints had you filed with either the EEOC or with the Michigan Department of Civil Rights?

A. I can't remember at this time.

Q. Okay. Do you know if RUM Bailey was aware of these complaints?

A. More than likely he was.

Q. What do you base that belief on?

A. He's the Department of Corrections' supervisor.

.　　.　　.　　.　　.

Q. Okay. You say that all the black officers were removed from the cell block, is that what we were discussing before, the memo from Captain White?

A. Yes.

Q. And you were the only officer, black officer, who grieved that removal from the cell block?

A. Yes.

Q. And you were the only one that was returned?

A. Yes.

Based on this colloquy, it appears that MDOC in general, and Bailey in particular, were aware that Allen had filed grievances. At the time of Allen's removal from Block Eight, Bailey was the Resident Unit Manager of that block. We can certainly infer that Bailey, as unit supervisor, was aware that Allen had filed a grievance upon his reinstatement to Block Eight. In addition, MDOC was the defendant in all the suits filed by Allen. It is disingenuous to argue that MDOC was not aware that Allen had filed grievances against it. We therefore believe that Allen has established that MDOC was aware of his protected activity.

Allen also must show that he suffered an adverse employment action. As previously stated, Allen's failure-to-promote claim is the only adverse employment action alleged.

■■■■ Finally, Allen must show that there was a causal connection between the filing of his civil rights lawsuits and MDOC's failure to promote him. In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action. *See EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) (citations omitted); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir.

1984). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *See Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir.1987). In addition, the burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met. *See Avery*, 104 F.3d at 861.

Despite this easily met burden, Allen has failed to present sufficient evidence in this case to allow us to draw an inference that he was denied a promotion because he previously had filed discrimination actions. As we have noted, Allen's allegations regarding MDOC's failure to promote him are vague and generalized. Allen has not presented any specific dates or incidents in which he was denied a promotion, nor does he show that he was treated differently from identically situated employees. Instead, Allen merely states that he was not promoted to sergeant while non-black employees were promoted to sergeant. Despite the repugnance of the allegations made, such conclusory allegations are insufficient to establish causation. Accordingly, we conclude that Allen failed to establish a prima facie case of retaliation and, therefore, affirm the district court's grant of summary judgment as to this issue.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to MDOC on Allen's claims of racial discrimination and retaliation, and **REVERSE** its grant of summary judgment to MDOC on Allen's claims of racial harassment. We therefore **REMAND** this case to the district court for further proceedings in accordance with this opinion.

BATCHELDER, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that Allen's retaliation, discrimination, and co-employee harassment claims cannot withstand sum-

mary judgment. I also agree with its decision to extend the holdings of *Burlington Indus., Inc. v. Ellerth,* — U.S. —, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* — U.S. —, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), to claims of racially hostile work environments created by supervisors. I do so because I believe, based on Supreme Court precedent, that the Court would do likewise if squarely faced with the question.[1] I respectfully dissent, however, from the reversal of the grant of summary judgment to MDOC on Allen's claims of racial harassment.

In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), relying heavily on the reasoning articulated in racially hostile work environment precedent, the Supreme Court extended Title VII's protections to claims of a hostile work environment resulting from sexual harassment. *See id.* at 65–67, 106 S.Ct. 2399. The Court in *Faragher* referenced this portion of *Meritor Savings Bank* as part of its analysis, *see* — U.S. at —, 118 S.Ct. at 2283, and then stated:

> In thus holding that environmental claims are covered by the statute, we drew upon earlier cases recognizing liability for discriminatory harassment based on race, just as we have also followed the lead of such cases in attempting to define the severity of the offensive conditions necessary to constitute actionable sex discrimination under the statute.

*Id.*(citations omitted). In *Faragher* the Court also noted, "Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." *Id.*

Also, the Court's interpretation of agency principles in *Ellerth* would appear to be simi-

larly applicable in the context of racial harassment. The Court noted two instances in which agency principles would warrant holding the employer vicariously liable for the actions of a supervisor: (1) where the employer's own negligence is a cause of the harassment, *see Ellerth,* — U.S. at —, 118 S.Ct. at 2267; and (2) where the supervisor is peculiarly aided in his harassment by his agency relationship with the employer, such as when the supervisor takes a tangible employment action against a subordinate, *see id.* at —, 118 S.Ct. at 2268–69. Such theories of liability do not rest on any principle that differentiates race-based and sex-based hostile work environment claims, and thus there is nothing from this reasoning to justify drawing such a distinction in the case *sub judice.*

Finally, from a pragmatic standpoint, the Supreme Court in *Ellerth* and *Faragher* made it more difficult for employers to escape liability, or at least to receive an award of summary judgment, for supervisor sexual harassment. To find the previous standard still applicable in cases involving supervisor racial harassment would result in sexual harassment plaintiffs' having an easier hurdle to overcome than racial harassment plaintiffs, a result I find highly unlikely given the reasoning and statements made by the Court in *Meritor Savings Bank* and *Faragher. See also Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir.1988) (Norris, J., concurring in part and dissenting in part) ("[T]he majority would leave this circuit with different standards for measuring Title VII claims based on hostile work environments, depending upon whether they are predicated on race discrimination or sex discrimination. It is because I believe that result is at odds with the Supreme Court's opinion in *Vinson,* that I dissent."). As Justice Thomas observed, "the primary goal of the Civil Rights Act of 1964 was to eradicate race discrimina-

1. While I agree that the decisions of our sister circuits on this question are persuasive authority, I write separately on this issue because I believe it important to provide at least a brief independent rationale for following the others' leads. I also disagree with the notion that because we have, pre-*Ellerth,* found the elements under sex-based and race-based hostile work environment claims to be the same, those precedents, therefore, counsel us to continue to find the elements the same post-*Ellerth.* Simply because the analyses *were* the same does not, *a fortiori,* mean that, when the Supreme Court modifies the analysis in one context, the other must or should be similarly modified.

tion and ... the statute's ban on sex discrimination was added as an eleventh-hour amendment in an effort to kill the bill." *Ellerth*, —— U.S. at —— n. 1, 118 S.Ct. at 2271 n. 1 (Thomas, J., dissenting).

While I agree with the majority that the change brought about by *Ellerth* and *Faragher* would likely extend to claims of racial harassment of an employee by a supervisor,[2] I do not believe that this warrants reversal of the summary judgment and remand of Allen's supervisor racial harassment claim in this case, and so I, accordingly, dissent from that aspect of the majority's decision.

Allen sufficiently alleged only two instances of supervisor racial harassment: (1) on October 9, 1990, Assistant Resident Unit Manager ("ARUM") Hilton allegedly told Allen that "he was lazy like the rest of his people and that is why they are all in prison"; and (2) over a year later, on October 27, 1991, Allen, while leaving work, engaged in a work-related argument with Sergeant Madery in which Madery allegedly stated, "I'm writing your black ass up," "Boy, I told you to get your black ass back into the block and finish your paper work," and "Allen you can't make sergeant because you won't play team ball," and as a continuation of this incident Madery allegedly told Allen that he was being transferred to a place where he could be watched more closely because "[n]iggers can't be trusted." In fulfillment of this latter statement, Sergeant Madery transferred Allen from the fourth gallery to the second gallery, which provided Madery a better view of Allen. *See* J.A. at 43 (Allen Dep. at 61–62).

Both of these instances of harassment by Allen's supervisors are repugnant. However, these two isolated instances, separated by over a year's time and involving different people, do not satisfy the requirement of "*severe* or *pervasive* conduct," *Ellerth*,

—— U.S. at ——, 118 S.Ct. at 2265 (emphasis added), that creates a hostile work *environment*. As the Supreme Court has long recognized, occasional utterances of racial epithets, although they engender offensive feelings in an employee, would not sufficiently alter the terms and conditions of employment to violate Title VII. *See Faragher*, —— U.S. at ——, 118 S.Ct. at 2283 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (same); *Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. 2399 (same); *see also Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1254 (6th Cir.1985) ("Courts addressing claims of hostile working environment have emphasized that incidents of racial slurs must be more than sporadic ...."), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); *Faragher*, —— U.S. at ——, 118 S.Ct. at 2283 (approving Second Circuit cases which stated that "incidents of environmental sexual harassment 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive'" (citations omitted)); *id.* ("We directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367)). *But see Davis*, 858 F.2d at 349 ("Drawing a distinction between 'isolated incidents' and a 'pattern of harassment' does not advance the analysis; the plaintiff need not prove that the instances of alleged harassment were related in either time or type."). Ac-

---

**2.** I must state my agreement with Justice Thomas that "[a]n employer should be liable if, and only if, the plaintiff proves that the employer was negligent in permitting the supervisor's conduct to occur," *Ellerth*, —— U.S. at ——, 118 S.Ct. at 2271; that the change brought about by the Court in *Ellerth* and *Faragher* is "a whole-cloth creation that draws no support from the legal principles on which the Court claims it is based,"

*id.* at ——, 118 S.Ct. at 2273; and that the new standard, as articulated by the Court in *Ellerth*, will result in "a continuing reign of confusion in this important area of the law," *id.* However, the new standard articulated by *Ellerth* and *Faragher* is now the law. Its propriety, although fair game for discussion and debate among academicians and the Justices themselves, is immaterial to our analysis.

cordingly, I would affirm the district court's grant of summary judgment.

The majority cites other allegations which it believes, when combined with those discussed above, sufficiently show severe or pervasive supervisor harassment warranting reversal of the district court. I cannot agree, however, that these other allegations support the majority's position.

First, the majority notes that "Bailey, another of Allen's supervisors, allegedly was informed by his supervisors not to allow Allen to serve as acting-sergeant when a sergeant was not present on the shift, although less experienced white officers were permitted to do so." Maj. Op. at 411.[3] Allen's deposition testimony concerning this allegation does not indicate that his supervisor was specifically told *not* to allow Allen to serve as acting-sergeant. Rather, it states that ARUM Hilton wrote a list of names in the log book, per the instruction of RUM Bailey, indicating who should be chosen to serve as acting-sergeant when one was needed, and that the names listed were those of white officers. There could be any number of non-race based reasons why Allen was not also listed, such as poor job performance. In fact, Allen admitted that before Hilton's notation in the log book, he had served as acting-sergeant, J.A. at 40 (Allen Dep. at 47), thus strongly indicating that some factor other than his race accounted for his not being included this time. Finally, while this allegation might amount to the beginning of a prima facie case for disparate treatment, it hardly indicates severe or pervasive racial *harassment.*

Second, the majority states, "Allen also points to the fact that his supervisors never investigated or disciplined the white officer caught removing the lock from Allen's locker with bolt cutters." Maj. Op. at 411. This statement, however, is not accurate. No white officer was "caught" removing the lock from Allen's locker; rather, Allen suspected a particular white officer because some *inmates,* whom Allen could not name, *allegedly*

told him that the officer had been the perpetrator, and because this same officer had checked out bolt cutters from the arsenal. J.A. at 315 (Allen Dep. at 66). Also, Allen never alleged that the officer was not disciplined, neither did he allege that his supervisor never investigated the incident. Rather Allen only alleged that an investigation was never *completed.* See J.A. at 10 (Complaint Count V, ¶ 6.D). Allen stated that he filed a complaint with RUM Bailey and specifically stated that "RUM Bailey investigated it." *Id.* Allen was then asked, "When you say no investigation was ever completed in paragraph 6(D) [of your complaint], what does that mean, if RUM Bailey conducted an investigation?" J.A. at 316 (Allen Dep. at 67). Allen replied, "Well, he never investigated if [the white officer] signed out on bolt cutters from the arsenal or not." *Id.* A supervisor's failure to turn over every leaf when investigating a claim can hardly be said to create or contribute to an overwhelming atmosphere of severe or pervasive racial harassment created by the supervisor.

Third, the majority states,

In addition, Allen claims that his supervisors treated him unfairly based upon his race on a continual, ongoing basis. In support of this statement, Allen claims that he, unlike white officers, was constantly observed and followed by Madery, Bailey and Hilton. Allen also claims that these supervisors monitored his work more closely than that of white officers. This allegation is supported by Madery's comment that Allen had to be watched more closely because "[n]iggers can't be trusted."

Maj. Op. at 411. Allen's claims of being "constantly observed and followed" by his supervisors while white officers were not, and that his work was monitored "more closely" than that of white officers, are unsupported by reference to any specific dates, instances, or events of such close observance or monitor-

---

**3.** Allen's deposition indicates that it was actually Resident Unit Manager ("RUM") Bailey who allegedly instructed Assistant Resident Unit Manager Hilton to place one of the three white officers in the role of acting sergeant when there was no sergeant on duty. See J.A. at 40 (Allen Dep. at 46).

ing.[4] Such vague allegations of harassment are insufficient to survive summary judgment. *See Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir.1994) ("Furthermore, Roberts' testimony that Lt. Campbell generally reprimanded Carter publicly but spoke with Carter's white co-workers in private is not substantiated by accounts of specific dates, times or circumstances. Such general allegations do not suffice to establish an actionable claim of harassment."); *Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1381 (7th Cir. 1986) ("The complaint alleges that TWA 'subjected Plaintiff to more tenuous circumstances of employment, unlike white employees, because he is black.' ... [W]e hold that such vague allegations were insufficient to raise a question of material fact as to the existence of actionable harassment and summary judgment was proper on these claims."), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987). The majority says that Sergeant Madery's statement (that Allen was "being transferred to a place where [Madery] could keep his eye on [Allen] because: 'Niggers can't be trusted,'" J.A. at 4 (Complaint at Count I, ¶ 3.D.)) supports Allen's claim that his work was monitored differently from that of white officers. It does. However, it is the only evidence in support of that claim, and, reprehensible as it is, Madery's comment and the associated transfer from the fourth to the second gallery is still a lone, isolated incident.

Fourth, the majority states, "Allen's other claims of ongoing harassment include the receipt of counseling memoranda from his supervisors when Allen was several minutes late returning from lunch which resulted, Allen claims, from falsifications of the log book." Maj. Op. at 411. While Allen does make this claim, he fails to state any facts from which one could infer that such actions were racially motivated. The simple fact that he is black and bad things happen to him does not, without more, sufficiently state a claim for racial harassment.

Fifth, the majority points to the threatening, racially inflammatory note Allen found among his possessions. In its attempt to link this offensive note to the supervisors, the majority writes,

> Although this event could not be directly attributed to Allen's supervisors, there is at least an inference that the supervisors condoned the action as the perpetrator(s) were never found. Moreover, the supervisors themselves could not be ruled out as the perpetrators, given their racially motivated insults directed at Allen.

Maj. Op. at 411. These two sentences, in my view, are the most disturbing in the majority's opinion. First, the fact that the perpetrators were never found *does not* create "an inference that the supervisors condoned the action," as it is undisputed that MDOC conducted a thorough investigation of this incident that included analyzing handwriting samples and interviewing employees. In fact, Allen's only complaint with the in-

---

4. In support Allen claims that ARUM Hilton
> would come up on my gallery, and he would just stand there and he would follow me around. If I was talking to a prisoner he was standing there with his watch, and he would time the length of time that I talked to a prisoner, or either a prisoner was cleaning the gallery and a gate was open, he was standing there and timed how long the gate should be open.

J.A. at 42 (Allen Dep. at 55–56). He could not give specific dates or recall the frequency of these visits, however. J.A. at 43 (Allen Dep. at 60). He also claims that RUM Bailey "was always coming up on the gallery and check[ing] my work, check[ing] my cells." J.A. at 43 (Allen Dep. at 59). However, Allen further stated that he did not keep track of the frequency of these "visits" and that he never discussed the extent to which Bailey checked the work of any of the other officers.

More importantly, he points to nothing that would indicate that these instances of "closer monitoring" were motivated by racial animus, other than his feeling that Hilton and Bailey did not do as much monitoring of the white officers. He fails to point out, however, evidence indicating that this increased monitoring was the result of his poor work performance, as indicated in a counseling memorandum written on January 8, 1990, in which he was reprimanded for leaving unsecured the gate and brake box for which he was responsible, a major security violation. The memo stated, "This counseling memorandum is to put you on notice that this type of behavior is dangerous, violates policy and procedure, and will not be tolerated. *Your areas of control will be closely monitored in the future by the management team in this block.*" J.A. at 82 (1/8/90 Counseling Memo (emphasis added)).

**418**

vestigation was that he thought MDOC "should have fingerprinted the threatening note," Maj. Op. at 408; see also J.A. at 42 (Allen Dep. at 54–55), not that the investigation itself was corrupt or pretextual. Second, and more importantly, while the majority states that "the supervisors themselves could not be ruled out as the perpetrators," there is absolutely no evidence linking the note to any of Allen's supervisors,[5] and Allen specifically testified that he had no idea who wrote the note. J.A. at 42 (Allen Dep. at 54). This is an important point, because under the new standards articulated by *Ellerth* and *Faragher*, harassment claims premised upon supervisor conduct are viewed under a different standard from those premised upon co-employee conduct. Under the majority's reasoning, when determining whether the plaintiff has made a sufficient showing of pervasively hostile supervisor harassment sufficient to withstand summary judgment, incidents of racial harassment for which the perpetrator is unknown are ascribed to the supervisor, so long as the supervisor has made a racially derogatory remark at some time in the past. Thus, under the majority's opinion employers may be held vicariously liable for incidents which may or may not have been attributable to supervisory employees, a result that I find unsupported by either *Faragher* or *Ellerth*. The underlying support for *Ellerth*'s holding is agency law, see *Ellerth*, —— U.S. at —— –——, 118 S.Ct. at 2265–66, in which " '[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment,' " *id.* at ——, 118 S.Ct. at 2266 (quoting RE-STATEMENT (SECOND) OF AGENCY § 219(1) (1957)). When establishing the vicarious liability of the master, it has always been the plaintiff's burden first to establish that the servant's actions were the cause of his injury before the issue of employer liability is ever reached. Accordingly, it was Allen's burden to show that the author of the racially harassing note was a supervisor before he

could succeed in having that incident reviewed under *Ellerth*. This he has not done, and thus the majority errs in recognizing the note as cognizable when analyzing whether Allen has established a pervasively hostile work environment premised upon the actions of supervisory employees.

In sum, besides the two instances I have noted above, I cannot find allegations of *supervisor* harassment sufficient to create a question of fact over whether Allen's supervisors' actions were severe or pervasive enough to create a hostile work environment. "The standards for judging hostility" under Title VII are supposed to be "sufficiently demanding [so as] to insure that Title VII does not become a 'general civility code.' " *Faragher*, —— U.S. at ——, 118 S.Ct. at 2283 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)). When "[p]roperly applied, they . . . filter out complaints attacking 'the ordinary tribulations of the workplace, such as . . . the sporadic use of abusive language.' " *Id.* (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992)). Two instances of racially offensive and abusive language, uttered by different people and separated by over a year do not, without more, turn every other incident of perceived disparate treatment or maltreatment that occurred over the course of six years into instances of racial harassment.

---

5. In fact, the handwriting samples were examined by a document examiner from the Office of Inspector General, see J.A. at 65 (Document Examiner's Report), who concluded, "It is my opinion that the questioned printing appearing on the derogatory note is not identified with the known writing/printing of the following individuals: C/O Albert Allen C/O Hemenway *Sgt. Michael Madery* C/O J. Jones John T. Upshaw C/O Houghton *RUM T. Bailey* C/O Lamb". J.A. at 65 (Doc. Examiners Rep. (emphasis added)).