**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0795n.06
Filed: November 14, 2007

**No. 07-5169**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TERRI Q. COLEMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ARC AUTOMOTIVE, INC., | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |

Before: MERRITT, ROGERS, and McKEAGUE, Circuit Judges.

**ROGERS, Circuit Judge.** Plaintiff brought suit under Title VII alleging that her employer discriminated against her on the basis of sex and race, subjected her to a hostile work environment, and retaliated against her. The district court granted summary judgment to the employer, concluding that plaintiff failed to establish a *prima facie* case with respect to all claims. Because plaintiff has failed to make a showing sufficient to establish the existence of elements essential to each of her claims, we affirm.

**I.**

Plaintiff Terri Q. Coleman is an African-American female who has been employed by Defendant ARC Automotive, Inc. ("ARC") as a general machine operator for over 12 years. During that time, Coleman was a member of the Union of Needletrades, Industrial and Textile Employees

AFL-CIO Local 906 ("Union"). On April 24, 2004, Coleman was elected to serve as plant president for the Union. Less than one year later, the Union removed Coleman as president and expelled her after finding that Coleman had engaged in activity disloyal to the Union. Nevertheless, Coleman continued to perform her regular job as general machine operator for ARC.

Coleman admits that she was not subjected to sex or race discrimination prior to being elected Union president. It was not until after she became president, Coleman alleges, that ARC and its employees and agents subjected her to acts of retaliation, harassment, intimidation, and disparate and unfair treatment. Coleman also claims that ARC retaliated against her by, among other things, delaying her receipt of overtime pay and denying her benefits under the Family and Medical Leave Act (FMLA). According to Coleman, ARC retaliated because she assisted other employees with Title VII issues and because she filed a complaint against ARC with the United States Equal Employment Opportunity Commission ("EEOC").

Coleman points to several instances of conduct to support her claims. First, Coleman's predecessor as Union president was an African-American male named Jacob Grant. Coleman asserts that she was subjected to humiliation when ARC employees Robin Whyte, Senior Plant Manager, and Darryl Bunch, referred to her as the "Anointed One" and the "new little Jacob" when they first introduced Coleman as Union president to other employees. Additionally, Coleman contends that, after she was elected Union president, Whyte told Grant that "they do not need anyone like Terri Coleman as Union President."

Second, Coleman alleges that during her time as Union president, she was subjected to continuous surveillance from supervisors and guards, who were instructed to report Coleman's contact with employees. Coleman points to the affidavit of Larry Daniels, a security guard at ARC, who stated that he received special instructions to monitor Coleman and was never given similar instructions regarding any other employee or Union representative. Coleman admits that supervisors never directly told her that they had been instructed to monitor her.

Third, Coleman contends that, under orders from Jackie Theg, ARC's Director of Human Resources, Coleman and her vice president were stopped and informed that both individuals could not attend a meeting on behalf of an employee facing disciplinary action. It is undisputed, however, that ultimately both Coleman and the vice president were allowed to attend the meeting.

Fourth, Coleman alleges that ARC management subjected her to automatic stops at guard gates and that management included a photograph of Coleman in a notebook that contained photographs of employees who had previously been terminated by ARC. Coleman admits that the stops only occurred when she entered the company premises on Union business, not when she reported for her normal work shift. She further admits that she waited no more than a few minutes at the guard gate at any given time. It is also undisputed that the Collective Bargaining Agreement ("CBA") between the Union and ARC provided that Union representatives consult with ARC human resources personnel before entering company facilities during business hours. ARC human resources director Theg testified that other Union presidents—including the current president, who is a white male—have complied with the same check-in procedures required of Coleman. Terry Gallman, who

served as Union vice president under Coleman, stated in an affidavit that, to his knowledge, no other Union representative or officer that worked for ARC had ever been subjected to the same procedures.

Fifth, Coleman asserts that on one occasion, after she had been removed as Union president, ARC paid her $76 less than she had earned. When Coleman sought a remedy for the discrepancy, she was improperly informed by an ARC employee that she needed to file a grievance. Coleman admits that, shortly thereafter, another ARC employee corrected the error and Coleman received the outstanding amount owed to her three business days after she discovered the discrepancy.

Sixth, Coleman contends that she was improperly denied benefits under the FMLA. Coleman argues that ARC requested re-certification of her FMLA status even though re-certification was not required. Coleman admits, however, that ARC requested re-certification only after Coleman, upset over the pay discrepancy described earlier, left work in the middle of a shift, stating to her supervisor: "It's FMLA, I'm going to have to leave." Coleman further admits that her FMLA status lapsed after she presented re-certification papers to her doctor and her doctor did not sign the papers. Theg testified in her deposition that any supervisor who believes an employee is abusing FMLA benefits may request re-certification.[1]

---

[1]Coleman also claims in both her appellate brief and her memorandum in opposition to summary judgment that, at some point, Theg refused to accept a grievance filed on behalf of Coleman because Theg did not agree with the language used in the grievance. Coleman points to no evidence in the record to substantiate this claim.

- 4 -

In addition, the record indicates that during Coleman's time as Union president, ARC management believed that Coleman had violated the CBA on several different occasions. For example, on November 30, 2004, Theg wrote a letter to Kathy Mays, a Union representative, stating that Coleman had persistently violated the CBA by interfering with employees during working hours. In the letter, Theg reported calls from managers at two ARC plants complaining that Coleman was interfering with production by handing out letters and carrying on conversations with employees during working hours. Theg also stated in her deposition that "people were coming to me, supervisors, product team managers. . . . [b]ecause [Coleman] was being abusive with her rights as a union president. And was being disruptive and just not following the contractual agreement." Additionally, the record indicates that, at one point, Theg escorted Coleman out of a plant because Coleman was engaging in disruptive behavior and had failed to notify the company that she was on the premises. Coleman stated that Theg told her "that was [Theg's] last time telling [Coleman] not to be on the property without having permission" and that Theg did not make any racial or sexual comments at that time. In her deposition, Theg stated that she escorted Coleman out of the plant because Coleman "was disrupting production" and that "when [union presidents] are [on company premises] on an off shift, they have to allow notification."

Coleman first complained of racial and sexual discrimination at ARC on September 30, 2005, when she filed a "Charge of Discrimination" with the EEOC. On February 8, 2005, the EEOC issued a determination stating that it was unable to conclude that a violation of Title VII occurred. After Coleman requested reconsideration, the EEOC sent a letter to Coleman dated April 7, 2006,

stating: "There are no indications that further investigation would disclose a violation under Title VII . . . . The result of the investigation, including witness statements, indicated that the actions taken had everything to do with union activity and nothing to do with a Title VII violation." On May 8, 2006, Coleman commenced the instant action in federal district court. On January 31, 2007, the district court granted summary judgment to ARC, reasoning that Coleman had failed to establish a *prima facie* case for her claims against ARC.

## II.

Because Coleman has failed to make a showing sufficient to establish the existence of elements essential to her claims against ARC, we affirm. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Coleman has provided no direct evidence of discriminatory animus or retaliation and thus bears the burden of establishing a *prima facie* case for each of her claims. Summary judgment was appropriate because Coleman has not made a showing sufficient to establish the existence of elements essential to her claims and on which she will bear the burden of proof at trial.

## A.

Coleman's discrimination claim fails because Coleman has presented no evidence that ARC subjected her to an adverse employment action. Because Coleman has not presented direct evidence

of discriminatory animus,[2] she must establish a *prima facie* case of race or sex discrimination by showing that she (1) is a member of a protected class, (2) was subjected to an adverse employment action, (3) was qualified, and (4) was treated differently than similarly situated white and/or male employees. *McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006). Under the adverse employment action prong, Coleman must demonstrate that she experienced a "materially adverse change in the terms and conditions of [her] employment." *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000) (quoting *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999)).

As evidence of adverse action, Coleman points to the $76 pay discrepancy, her loss of FMLA benefits, pervasive monitoring and gate guard checks, and certain comments made by ARC personnel. Coleman contends that these activities "undermined and served to deprive [her] of her position as the first female African-American and [sic] Union President." The conduct that Coleman complains of, however, is not sufficient to establish a genuine issue of material fact as to whether ARC subjected her to an adverse employment action. This court has stated that,

---

[2]Coleman contends that "statements made by management regarding Ms. Coleman's election as Local 906 Union President is [sic] direct proof of racial and sexual animus against her." The incidents Coleman refers to—namely, that she was introduced as the "Anointed One" and the "new little Jacob" after she won election as Union president—do not provide direct evidence of racial or sexual animus. *See, e.g.*, *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) ("Direct evidence is that evidence which, if believed, *requires* the conclusion that [race or sex] was a motivating factor in the employer's action.") (emphasis in original). Similarly, the statement allegedly made by an ARC manager that "they do not need anyone like Terri Coleman as Union President" fails to establish direct evidence of animus on the basis of sex or race.

> [a] materially adverse change [in the terms and conditions of employment] might be indicated by a termination of employment, a demotion evidenced by a decrease in salary or wage, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

See Bowman, 220 F.3d at 461–62 (quoting Hollins, 188 F.3d at 662). Here, Coleman admits that she was never terminated, suspended, demoted, docked pay, or moved to a less desirable shift. Nevertheless, Coleman argues that actions taken by ARC qualify as adverse employment actions because they are "unique to [her] particular situation" as the first female African-American Union president. This argument lacks merit.

First, Coleman admits that she obtained relief from the $76 pay discrepancy only three days after reporting it. A three-day deprivation of $76 cannot reasonably be considered a materially adverse change in the terms and conditions of Coleman's employment. The same is true of Coleman's loss of FMLA benefits. ARC's human resources director Theg testified that any supervisor could request FMLA re-certification if the supervisor suspected that an employee was abusing his or her FMLA status. The record is clear that Coleman's supervisor requested FMLA re-certification only after Coleman abruptly left work mid-shift, telling her supervisor that "[i]t's FMLA, I'm going to have to leave." Coleman offers no evidence to suggest that the re-certification request was improper and admits that her FMLA status lapsed only after she failed to obtain her doctor's signature on the re-certification papers. Presumably, had Coleman obtained her doctor's signature, her FMLA benefits would have continued in effect.

Second, the targeted surveillance and gate guard stops alleged by Coleman do not qualify as adverse employment actions. Coleman testified that the stops lasted no longer than a few minutes and admitted that supervisors never directly told her that she was being monitored. Coleman points to the affidavit of one gate guard who claimed that he was instructed to monitor Coleman. She also points to the affidavit of her Union vice president who claimed that Coleman received special treatment. But these affidavits fail to make a showing sufficient to establish that Coleman's employment at ARC was materially altered by monitoring and gate checks. Indeed, it is undisputed that these activities never occurred when Coleman arrived for her normal shift work.

Third, Coleman lost her position as Union president solely as the result of Union action. Record evidence indicates that the Union, not ARC, held the hearing that resulted in Coleman's ouster as Union president. The record also indicates that Coleman was removed from the presidency for reasons independent of any action taken by ARC management. Coleman offers no evidence to support her contention that ARC management influenced her removal. Rather, the record indicates that ARC allowed Coleman to perform her job as a general machine operator generally unimpeded before, during, and after her Union presidency.

In sum, Coleman's discrimination claim fails because Coleman has not made a showing sufficient to establish that ARC subjected her to an adverse employment action.

**B.**

Coleman also asserts that ARC retaliated against her for engaging in activity protected by Title VII. This claim fails because, first, Coleman has not made a showing sufficient to establish that ARC subjected her to a materially adverse employment action and, second, Coleman has not established that a causal connection exists between her protected activity and the adverse employment action she alleges. Because Coleman has offered no direct evidence of retaliation, Coleman must show that (1) she was engaged in activity protected by Title VII, (2) the employer knew of the activity, (3) the employer subsequently took a materially adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). In the retaliation context, an adverse employment action is one that "a reasonable employee would [find] . . . materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (citations and quotations omitted).

Coleman contends that ARC retaliated against her because she was active and aggressive as Union president in pursuing and protecting employee rights under Title VII and because she filed a complaint against ARC with the EEOC. As evidence of retaliatory conduct, Coleman again points to automatic stops at guard gates, comments made by management, the $76 pay discrepancy, and her loss of FMLA benefits. ARC took these actions, Coleman argues, to dissuade her from assisting or participating in Title VII proceedings.

As a preliminary matter, most of the conduct Coleman complains of occurred before she filed the EEOC charge, and thus cannot be used to support a retaliation claim with respect to the EEOC complaint. The only post-EEOC complaint conduct that Coleman alleges is the pay discrepancy and loss of FMLA status. But, as explained in Part II.A., *supra*, the loss of FMLA benefits occurred only after Coleman's doctor failed to sign the re-certification papers and the $76 pay discrepancy lasted only three days. It cannot reasonably be argued that these circumstances would have dissuaded a reasonable worker from asserting Title VII protections. Coleman has therefore failed to provide any evidence of an adverse employment action to support her claim that she was retaliated against for filing the EEOC complaint. Further, the remaining conduct that Coleman complains of cannot be considered materially adverse to Coleman on the record in this case. Coleman offers scant evidence of monitoring and admits that the gate guard stops lasted only minutes. Moreover, the comments that Coleman attributes to certain ARC personnel simply would not have dissuaded a reasonable employee from asserting Title VII protections.[3]

Finally, even if ARC's conduct could be considered materially adverse to Coleman, Coleman has not made a showing sufficient to establish a causal connection between her Title VII activity and the adverse employment action she alleges of ARC. In addition to the EEOC complaint, Coleman contends that ARC retaliated against her for actively pursuing Title VII protections for employees.

---

[3]Coleman alleges that two ARC employees deemed Coleman the "Anointed One" and the "new little Jacob" when introducing Coleman as Union president to fellow employees. Additionally, one ARC manager allegedly told the outgoing Union president that "they do not need anyone like Terri Coleman as Union President."

But Coleman has offered no evidence from which to infer that ARC engaged in conduct based on Coleman's Title VII activities as Union president. In fact, the record does not shed light upon a single instance where Coleman assisted an employee with a Title VII issue. The topic was not covered in Coleman's deposition and, on appeal, Coleman points only to Theg's statement that Coleman spoke loudly at a meeting related to insurance benefits. Coleman's conduct at an insurance meeting, however, provides no insight into her Title VII activities as Union president.

Because Coleman has failed to make a showing sufficient to establish both a materially adverse employment action and a causal connection between that action and her protected activity, she has failed to meet her burden on summary judgment.

**C.**

Lastly, Coleman claims that ARC subjected her to a hostile work environment. This claim fails because, first, Coleman has failed to establish a genuine issue of material fact as to whether ARC subjected her to an unreasonably abusive or offensive work environment and, second, Coleman has failed to establish a genuine issue of material fact as to whether ARC undertook action based on Coleman's race or sex. To succeed on a hostile work environment claim, Coleman must establish that the conduct at issue was "severe or pervasive." *Allen v. Michigan Dept. of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999). "The alleged conduct [must] constitute[] an unreasonably abusive or offensive work-related environment or adversely affect[] the reasonable employee's ability to do his or her job." *Id.* (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)). Coleman must

also demonstrate that the alleged harassment was based on her sex or race. *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 600 (6th Cir. 2007).

As evidence of a hostile work environment, Coleman once again points to comments made by ARC management, automatic stops at guard gates, targeted surveillance, the $76 pay discrepancy, and her loss of FMLA status. Additionally, Coleman claims that she suffered embarrassment and humiliation when she was initially prevented from attending an employee disciplinary hearing. The conduct Coleman complains of, however, fails to establish that a genuine issue of material fact exists as to whether ARC subjected Coleman to "severe or pervasive" conduct.

As noted above, ARC quickly fixed Coleman's pay discrepancy and Coleman lost her FMLA status only after her doctor failed to sign re-certification papers. It is also undisputed that Coleman ultimately did attend the employee disciplinary meeting after initially being stopped at the door. Further, the comments that Coleman attributes to management were not abusive or offensive in quality, nor does the record contain evidence suggesting that the monitoring of Coleman or the gate guard stops inhibited Coleman's ability to do her job. Indeed, Coleman testified that the stops lasted no longer than a few minutes and that she was never directly told by a supervisor that she was being monitored. On one occasion, Coleman was escorted out of a plant when she was on Union business, but this incident does not rise to the level of "severe and pervasive" conduct and Coleman has not alleged that her freedom of movement was ever impeded when she was in the plant for her normal shift work. Coleman has therefore failed to establish a genuine issue of material fact as to whether the conduct she complains of "[constituted] an unreasonably abusive or offensive work-related

- 13 -

environment or adversely affected the reasonable employee's ability to do his or her job." *Allen*, 165 F.3d at 410.

Concomitantly, Coleman has failed to establish that a genuine issue of material fact exists as to whether any action taken by ARC was taken on the basis of her race or gender. Coleman offers no evidence of racial or sexual comments made by ARC personnel. Moreover, Coleman fails to rebut significant evidence in the record that suggests that ARC's actions were the result of its belief that Coleman, as Union president, continuously engaged in conduct that disrupted production and violated the CBA. Thus, even if Coleman was treated differently or more unfairly than every other Union president, she has failed to establish that the difference in treatment was due to her being the first female African-American Union president. Rather, the record indicates that Coleman may have been treated differently because ARC perceived her to be the first Union president to persistently violate the CBA.

In sum, Coleman has failed to meet her burden on summary judgment with respect to her hostile work environment claim.

### III.

For the foregoing reasons, the judgment of the district court is affirmed.