Larry SNOWDEN, Plaintiff–Appellant,

v.

PROCTOR & GAMBLE DISTRIB-
UTING COMPANY, Defen-
dant–Appellee.

No. 00–5268.

United States Court of Appeals,
Sixth Circuit.

July 17, 2001.

Before KEITH, BATCHELDER, and
MOORE, Circuit Judges.

OPINION

PER CURIAM.

Plaintiff-appellant Larry Snowden
brought an action against his former em-
ployer for alleged disability discrimination.
The district court held that Snowden es-
tablished a prima facie case of discrimina-
tion, but failed to show that the employer's
reason for his termination was a pretext

for discrimination, and granted the employer's motion for summary judgment. For the following reasons, we AFFIRM.

## I. BACKGROUND

### A. Factual History

Larry Snowden was employed by defendant-appellee Procter & Gamble Distributing Company ("P&G") for approximately ten years prior to his termination on December 6, 1995. Snowden suffers from high blood pressure and severe chronic depression.

Snowden first sought treatment for depression in 1993, and at that time his doctor excused him from work for a brief period. In 1994, at Snowden's request, P&G placed work limitations on Snowden, such as restricting him from operating moving equipment, and allowed him to work on a limited duty basis. When Snowden requested that he return to regular duty basis, P&G complied with his request. Subsequently, Snowden experienced sporadic and intermittent panic attacks, and could not function on some days. At his request, P&G allowed him to work limited duty on a day-to-day basis through the fall of 1995.

The parties do not dispute that each time Snowden asked for an accommodation due to his depression and/or high blood pressure, P&G granted the accommodation. When Snowden requested an accommodation, he was allowed to engage in job study and training rather than production floor work.

During the fall of 1995, Joe Cox became Snowden's work team manager. In a meeting on Thursday, November 30, 1995, Cox told Snowden that their work team could not support Snowden's sporadic and unpredictable accommodation requests indefinitely, as such absences worked a hardship on the team. Cox asked that Snowden provide medical verification of his need for further accommodation. Also

at this meeting, Cox told Snowden that a P&G employee had seen Snowden with his daughter at Wal-Mart the previous evening, November 29, during Snowden's shift. Snowden denied leaving the plant, except for a cigarette break as permitted by P&G's rules. Cox told Snowden that he would investigate the situation, and would meet with him on Snowden's next scheduled work day.

Cox met with Snowden again on Monday, December 4, 1995. Snowden told Cox that he had spoken with a nurse in P&G's health services department, and that the nurse agreed to contact Snowden's doctor about his continued need for an accommodation. Also at this meeting, Cox stated that he would continue to investigate the report that Snowden was seen at Wal-Mart during his shift. Snowden gave Cox the names of co-workers who might have seen him at the plant at the time he was allegedly seen shopping at Wal-Mart. Cox sent Snowden home for the day, with pay, so that Cox could investigate the matter.

Cox's investigation included receiving a written statement from Chiquita McBride, a P&G team manager. McBride was the employee who had informed Cox that she had seen Snowden at Wal-Mart on November 29, 1995. In her statement, McBride stated that she saw Snowden twice in the store at approximately 10:00 p.m., and that he was shopping with his daughter. Cox interviewed the security guards working at the exit near where Snowden was working on November 29. One guard reported seeing Snowden leave around 8:00 p.m., and did not see him return, although he could have returned while she was away from the entrance. The guard also stated that Snowden had received a number of telephone calls from his daughter prior to 8:00 p.m. that evening. Cox interviewed Snowden's five co-

workers whom Snowden alleged could verify his whereabouts on the night in question. Only one co-worker, Wanda Joyner, stated she saw Snowden at the plant around the time he was allegedly seen at Wal–Mart. Joyner stated that she saw Snowden in the P&G computer room around 9:30 p.m.

Cox prepared a written memorandum outlining his investigation, which he provided, along with his interview notes and McBride's statement, to Terrence Poteet, P&G's Human Resources Manager. Based on his investigation, Cox recommended to Poteet that Snowden be terminated. Based on an independent review of Cox's investigation, Larry Brunner, P&G's human resources representative, also recommended to Poteet that Snowden be discharged for his misconduct.

Poteet reviewed Cox's investigation memorandum and interview notes, and McBride's written statement. Poteet decided that Snowden should be terminated, and got approval of (or agreement with) this decision by Mitchell Tinnan, P&G's plant manager. Snowden was discharged December 6, 1995.

### B. Procedural History

Snowden timely filed a charge of discrimination with the Equal Employment Opportunity Commission, and received notification of his right to sue. On December 17, 1998, Snowden filed a complaint in the United States District Court for the Western District of Tennessee, alleging unlawful discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. § 8–50–103 *et seq.*

Following the completion of discovery, P & G moved for summary judgment on the grounds that (1) Snowden did not suffer from a disability within the meaning of the ADA; and (2) Snowden was fired based on

P&G's good-faith belief that Snowden had left work during his shift, a violation of company policy, and then lied about it when questioned.

The district court granted P&G's motion for summary judgment. The court concluded that Snowden had alleged sufficient evidence that he had a disability within the meaning of the ADA. The court concluded, however, that Snowden had failed to come forward with evidence that P&G's stated reason for firing him was pretextual. The court concluded that P&G's investigation of Snowden's alleged misconduct was reasonable, and that P&G had pointed to sufficient, particularized facts on which it based its decision to terminate Snowden. The district court concluded that Snowden failed to point to facts from which a reasonable trier of facts could find that P&G's investigation was insufficient or that it had made an unreasonable decision in light of the facts. Accordingly, the district court dismissed Snowden's complaint with prejudice.

Snowden filed a timely notice of appeal from the judgment of the district court. Snowden contends that the district court erred in dismissing his ADA claim.

## II. DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment *de novo*. *See Parry v. Mohawk Motors of Mich., Inc.,* 236 F.3d 299, 307 (6th Cir.2000). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, we draw all reasonable inferences in the light most favorable to the

non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Petrey v. City of Toledo,* 246 F.3d 548, 553 (6th Cir.2001). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Analysis

According to Snowden, P&G violated the ADA when it terminated him due to his disability. The ADA provides that a covered employer may not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a claim under the ADA, the plaintiff must present either direct evidence of discrimination or present a prima facie case of discrimination. *See Martin v. Barnesville Exempted Village Sch. Dist. Bd. of Educ.,* 209 F.3d 931, 934 (6th Cir.2000). The parties do not dispute the district court's conclusion that Snowden established a prima facie case of discrimination.

Once Snowden established a prima facie case of discrimination, the burden shifted to P&G to provide a legitimate, non-discriminatory explanation for the decision to terminate him. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 779 (6th Cir.1998). P&G has articulated a legitimate, non-discriminatory reason for terminating Snowden, *i.e.,* because Snowden left the P&G plant during working hours without authorization, and lied to conceal his misconduct.

Because P&G proffered a legitimate reason, the inference of discrimination disappeared, and Snowden was required to prove by a preponderance of the evidence that P&G's proffered reason was a pretext for intentional discrimination. *See Martin,* 209 F.3d at 934; *Cehrs,* 155 F.3d at 779. In order to show pretext under the ADA, an employee can show that the employer's proffered reason "had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *See Smith v. Chrysler Corp.,* 155 F.3d 799, 805–06 (6th Cir.1998) (citing *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 883 (6th Cir.1996)). While the temporal proximity of Cox's discussion with Snowden about the problem created by Snowden's unpredictable need for accommodation and the discharge gives us pause, it does not rebut P&G's legitimate reason for discharge.

We first note what Snowden does not allege. While Snowden denied leaving the plant when questioned by Cox and at his deposition, Snowden does not argue that P&G's proffered reason for terminating him had no basis in fact, and he does not contend that P&G was mistaken in its conclusion that he left the plant to go shopping with his daughter. Snowden does not contend that his alleged violation of company policy did not actually motivate P&G's decision to terminate him. Snowden does not suggest that the reason he was fired was never used in the past to discharge another employee. Finally, Snowden does not dispute that leaving the plant while on duty is a legitimate reason for discharge.

Snowden's only contention, both here and before the district court, is that P&G

failed to make a reasonable and informed decision to terminate him. Snowden contends that there were deficiencies in P&G's investigation, and that therefore, P&G's reason for terminating him was not honestly held.

In *Smith v. Chrysler Corp.*, we held that an employer's proffered nondiscriminatory basis for its adverse employment action cannot be pretext for disability discrimination if it is honestly held. *See Smith,* 155 F.3d at 806–08. However, to establish that the proffered nondiscriminatory reason for its employment action was honestly held, "the employer must establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* at 807. If the employer produces such evidence, "the employee has the opportunity to produce 'proof to the contrary.'" *Id.* (quoting *Pesterfield v. Tenn. Valley Auth.,* 941 F.2d 437, 443 (6th Cir.1991)). "In deciding whether an employer reasonably relied on the particularized facts before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.* Rather, we must determine "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citation omitted).

We conclude that P&G met its burden of pointing to particularized facts underlying its decision, and that Snowden has identified no evidence tending to cast doubt upon P&G's decisional process. Upon learning that Snowden was allegedly seen during his shift at Wal–Mart, Cox received instructions from P&G's human resources representative about how to conduct an investigation of the allegation. Following these instructions, Cox prepared a written memorandum outlining the investigation. The investigation, which spanned several days, included interviewing Snowden, security guards who were on duty on November 29, and several of Snowden's co-workers. Cox also obtained a written and signed statement from McBride indicating she had seen Snowden at Wal–Mart on the night in question. Therefore, the facts relied upon by P&G in making its determination include an eyewitness statement of the violation made by a P&G manager, who had no apparent reason to lie about seeing Snowden, and who was absolutely certain about her allegation.

We must accept P&G's honestly held belief that Snowden left the plant to go shopping during working hours and then lied about it when questioned, even if the actual facts are otherwise, unless Snowden has produced sufficient "proof to the contrary" to suggest that P&G "failed to make a reasonably informed and considered decision." *Smith,* 155 F.3d at 807. Our careful review of the record reveals that Snowden has produced no "proof to the contrary."

In an effort to demonstrate that P&G failed to make a reasonably informed and considered decision, Snowden has come forward with suggestions of additional avenues of investigation that P&G could have taken. Snowden suggests that the investigation could have included: (1) asking the security guards whether they noticed if Snowden's car was present or absent on the night in question; (2) asking Snowden's co-worker Ms. Joyner how long they conversed in the computer room on the night in question; (3) contacting Wal–Mart to see if Snowden passed a check or used a credit card at that store on the night in question; and (4) reviewing Wal–Mart's security camera videos, if any, to see if Snowden was at the store on the night in question.

Snowden's suggestions are not evidence showing that P&G's reliance on its investigation was unreasonable, and we decline Snowden's invitation to "micro-manage" the process used by P&G in making its

employment decisions. *Smith,* 155 F.3d at 807. While P&G's investigation could have been more thorough, P&G was not required to leave no stone unturned. *See Smith,* 155 F.3d at 807. The evidence demonstrates that P&G made a reasonable effort in attempting to determine whether Snowden violated company policy, and the facts revealed by that investigation did not contradict McBride's allegation. Particularly where, as here, the plaintiff does not come forward with any evidence to demonstrate any error in the employer's determination, the plaintiff must come forward with something more than alternative avenues for investigation.

Snowden contends that P&G's reason for terminating was not honestly held because one of the facts revealed by P&G's investigation demonstrated that Snowden was in the plant shortly before he was allegedly seen at Wal–Mart by McBride. Snowden notes that his co-worker Wanda Joyner told Cox that she saw Snowden in the P&G computer room on the night in question at around 9:30 p.m. Snowden suggests that if Joyner had spoken to him for 20 minutes (which is entirely hypothetical), then he could not have been at Wal–Mart at 10:00 p.m. as McBride had alleged in her statement.

We reject Snowden's contention that P&G's failed to make a reasonable and informed decision to terminate him due to the existence of Joyner's statement. Joyner's allegation did not contradict McBride's statement that she saw Snowden at 10:00 at Wal–Mart, and accordingly does not make P&G's decisional process "unworthy of credence." *Smith,* 155 F.3d at 807, 808 (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Moreover, Snowden has produced no evidence that he and Joyner spoke at all, much less for 20 minutes, when she saw him in the computer room.

Snowden also contends that there are "numerous other deficiencies and inconsistencies" in the investigation which demonstrate that P&G's reliance on the facts before it when it decided to terminate Snowden was unreasonable. A thorough review of the record, however, reveals that Snowden bases this contention primarily on mischaracterizations of deposition testimony. Snowden has not carried his burden of demonstrating that P&G failed to make a reasonably informed and considered decision before terminating him. Accordingly, the district court did not err in granting P&G's motion for summary judgment.

## III. CONCLUSION

For the foregoing reasons, the decision of the Honorable James D. Todd of the United States District Court for the Western District of Tennessee is AFFIRMED.