William L. SINGFIELD, Plaintiff,

v.

AKRON METROPOLITAN HOUSING, AUTHORITY, et al., Defendants.

No. 5:02–CV–1706.

United States District Court, N.D. Ohio, Eastern Division.

May 20, 2003.

ORDER

GWIN, District Judge.

On March 10, 2003, Defendants Akron Metropolitan Housing Authority ("AMHA") and Anthony W. O'Leary ("O'Leary") moved this Court for summary judgment in the above captioned matter. Plaintiff William Singfield ("Singfield") opposes this motion. After considering the facts and applicable law, this

Court grants the defendants' motion for summary judgment.

## I. Facts

Singfield, an African–American male, claims that Defendant AMHA violated Title VII of the Civil Rights Act of 1964 and Ohio Rev.Code Chapter 4112 by terminating him for unlawful racially motivated reasons. Singfield also claims AMHA violated Title VII by retaliating against him after he earlier complained about racially discriminatory treatment. Plaintiff Singfield further brings claim under 42 U.S.C. § 1983, and alleges that AMHA deprived him of his constitutional right to due process and equal protection. Finally, Singfield also claims that Anthony W. O'Leary, the executive director of AMHA, used his position to deny the plaintiff his constitutional right to due process and equal protection.

The parties dispute the events that led to Singfield's termination. The defendants say AMHA fired Singfield because psychologists would not release Singfield to return to work after finding he had a personality disorder. The parties have, however, stipulated to the following facts. Singfield began working for AMHA as a regular, full-time employee on June 6, 1992. During his tenure at AMHA, Singfield moved up the ranks from a courier, to a janitor, to a painter, and finally to his last position as a maintenance worker. As a maintenance employee, AFSCME Local Union 2517 ("Union") represented Singfield.

Although AMHA says it fired Singfield because no mental health provider released him to return to work, it says this followed a long history of improper outbursts at work. For example, in May 1994, AMHA suspended Singfield for three days. The defendants say they suspended Singfield because he engaged in a verbal confrontation with two tenants, Mr. & Mrs. Montgomery,[1] and with his supervisor Allan Thomas. Additionally, AMHA says it suspended Singfield after he failed to follow instructions given to him by Juanita Martin, a management aide. Singfield admits cursing at tenant Mrs. Montgomery, but claims she provoked him.[2] Singfield admits that he ignored an instruction from Martin to open the door for Mrs. Montgomery. However, Singfield argues he justifiably ignored the instruction, given the animosity between the Montgomery family and himself. Singfield denies that any confrontation between him and Thomas occurred during this incident.

After another incident in August 1995, AMHA again suspended Singfield, this time for five days after he engaged in a

---

1. The Defendants say that two witnesses observed Singfield use loud, abusive, and profane language toward tenant Sandra Montgomery, after she walked across a floor he had just cleaned. Specifically, Singfield allegedly called Mrs. Montgomery a "bitch" and allegedly told her to "get her black ass off the floor." The Defendants also contend Singfield threatened Montgomery's son and called him a "bastard." The defendants say this incident led to a verbal altercation between Singfield and Mr. Montgomery later that month. The defendants say Singfield again used loud and abusive behavior toward Mr. Montgomery. Juanita Martin broke-up the incident.

2. Singfield claims Mrs. Montgomery, who is married, approached him about having a sexual affair. Singfield alleges that he rejected the sexual advance and reported Mrs. Montgomery's behavior to her husband. Singfield claims on the day in question, Mrs. Montgomery maliciously walked across a freshly waxed floor after repeated requests not to do so. Singfield also claims Mrs. Montgomery often asked her five year old son to kick Singfield to get his attention. Singfield denies he initiated the altercation between he and Mr. Montgomery. Singfield says Mr. Montgomery was the aggressor who stood in his face in a threatening manner.

verbal altercation with co-worker, Shelia Fambro.[3] A tenant and her young child witnessed the incident. AMHA claims Singfield used profanity and provoked Fambro. Singfield admits the suspension occurred. Singfield admits he used profanity, but justifies his conduct, saying he used profanity only after Fambro cursed and yelled at him. Singfield points out that AMHA reduced Fambro's suspension to one (1) day.

The defendants also say that in a 1998 work evaluation Singfield received an "Improvement Needed" citation in the area of "Relationships with Others." The defendants also claim Singfield received a "Weak" rating in the areas of "Conduct and Cooperation with Supervision" and "Conduction and Cooperation with Co-Workers" on the same evaluation. The defendants claim Singfield received the same "Improvement Needed" rating regarding his relationships with others in 1999. In that evaluation, Terry Foster, his supervisor, stated Singfield showed little "patience to hear other people out," and claimed this problem hurt his working performance. Reflecting further personality conflicts with his fellow employees and tenants, Executive Director O'Leary approached Singfield several times in 2000 to discuss his inability to get along with his supervisor, Terry Foster. The plaintiff does not directly deny that these events

occurred. Rather, the plaintiff asserts that after the August 1995 incident the defendants did not have a "record of any disciplinary problems with Singfield for another seven years."

On August 7, 2001, Singfield was involved in another incident involving a dispute with a supervisor. Michael Reinhart, Singfield's supervisor at that time, testified that he went to a vacant unit where Singfield was working. When he arrived at the unit, Reinhart says he asked Singfield what he had accomplished that day. Reinhart claims Singfield became very angry and accused Reinhart of being a racist. Reinhart says that he then told Singfield to finish the project. When he returned the next day, Reinhart says Singfield verbally abused and threatened him.[4]

Singfield admits an incident occurred on August 8, 2001, however, he claims that Reinhart initiated it. Singfield says when Reinhart arrived at the unit, he was standing on the balcony drinking water. Singfield says he was taking a fifteen minute break, which AMHA allowed under the union contract. Singfield says he told Reinhart he was taking a break, but Reinhart never-the-less summoned him inside the unit. Singfield testified that he walked in the unit, bypassing where Reinhart stood and walked over to the kitchen window where his radio sat.[5] Singfield says

---

**3.** Fambro is an African American employee who was painting a vacant unit when the altercation occurred.

**4.** Reinhart says Singfield was standing outside the unit when he arrived. Reinhart requested Singfield to come inside and Singfield replied that he could hear Reinhart from where he stood. After Reinhart asked Singfield to come inside a few more times, Singfield complied. Singfield allegedly walked over to his radio and turned the volume up. Reinhart says he told Singfield he had no intention of shouting over him and unplugged the radio. Singfield allegedly became angry

and moved about one inch from Reinhart's face and told him "he'd be sorry" if he touched Singfield's personal property again. Reinhart says he was frightened by Singfield's behavior.

**5.** Singfield says that Reinhart became angry after he walked over to the radio and "snatched" the cord out of the wall. Singfield says that he told Reinhart that his radio was not AMHA property and re-plugged the cord in the wall. Thereafter, Singfield claims Reinhart again "snatched" the cord from the wall, and walked within one inch of Sing-

that Reinhart got in his face after they exchanged angry words over the radio. Reinhart allegedly told Singfield that he was going to call Alan Thomas, Reinhart's supervisor.

The events that occurred after the verbal altercation between Reinhart and Singfield are uncontested. Thomas instructed Singfield to leave the premise until the human resources department contacted him. After Singfield left the premises, Reinhart found Singfield's key ring. The defendants claim there were six duplicate master keys on Singfield's key ring. The defendants say these duplicate master keys opened the doors to units that were outside Singfield's work area. Singfield does not deny that he possessed duplicate master keys on his key ring. However, Singfield claims AMHA issued these keys to him and did not require a signature for them. Singfield disputes the number of duplicate master keys found on his key ring, but never offers a definitive number to counter the defendants' number.

The defendants claim AMHA has a policy prohibiting employees from duplicating master keys or carrying these masters keys home or outside the assigned work area for any reasons. The plaintiff challenges the defenses' assertion that he violated the master key policy. The plaintiff claims the master key policy prohibits employees from duplicating master keys but does not ban possession of duplicate master keys.

Human Resources Director Christine Yuhasz set a meeting with Singfield for August 9, 2001.[6] Union president Eddie Davis, attended the meeting. Immediately before the meeting with Singfield, Yuhasz

met with Reinhart and O'Leary. Reinhart told Yuhasz and O'Leary that he feared Singfield. Reinhart said that Singfield had previously told him that he once laid in the snow outside his former supervisor's house with a shotgun waiting to assassinate the supervisor. Allegedly, Singfield told Reinhart that he could not go through with the assassination because his hands were too cold and could not pull the trigger.

Yuhasz then conducted the meeting with Singfield and Davis. The defendants say the meeting gave Singfield a chance to explain his version of events during the August 8, 2001 altercation. The defendants say that Singfield admitted the confrontation between he and Reinhart, but denied threatening Reinhart. The defendants also allege that Singfield said he knew nothing about the duplicate master keys found on his key ring.

The plaintiff paints a different picture. Singfield denies the shotgun incident. Singfield says it was Reinhart who confided in him and told Singfield that he once got so angry with his supervisor that he laid in the bed of a pick-up truck with a shotgun and waited to shoot his prior supervisor. Singfield says that in an effort to show sympathy toward Reinhart, he told Reinhart he had gotten very angry with a prior supervisor more than twenty (20) years ago. Singfield says he told Reinhart that his employer terminated him without cause and the termination had come within days of his step-children's funeral, who died unexpectedly in a fire. Singfield says that he thought about doing something to hurt his supervisor, but de-

---

field's face pointing his finger in an aggressive manner.

**6.** Yushaz held a second meeting with Singfield, Reinhart, and Davis on August 17, 2001. At that meeting, Yushaz gave Singfield a

chance to comment on the allegation that he laid in the snow with a shotgun waiting to kill his supervisor. Singfeild denied the allegation.

cided against it. Singfield explains that Reinhart took these statements and embellished upon them to create the story about Singfield planning to kill a supervisor. But, AMHA shows evidence that Singfield had earlier told Davis that he did lay in the snow with a shotgun waiting for his supervisor.[7]

After the second meeting with Singfield on August 17, 2001, Yushasz says Terry Foster, a supervisor for AMHA, contacted her and told her several employees indicated that they were concerned about Singfield returning to work. Also, Yushasz said that Tom Spurlock, the union steward, told her several employees were concerned and frightened about Singfield's return to work. AMHA says that it decided to suspend Singfield for thirty (30) days starting August 22, 2001, based on the confrontation Singfield had with Reinhart and Singfield's possession of six (6) duplicate master keys. Under his suspension, AMHA required Singfield to obtain anger management counseling and required him to get an approval from the counselor for his return to work upon completing the counseling. The plaintiff disputes whether the wording of the suspension actually required "completing a counseling program,"

"obtaining a release for work," or "attending counseling for 30 days."[8]

Singfield's suspension began August 22, 2001. He started counseling on September 17, 2001 at the Summit Psychological Associates, Inc. Singfield attended two assessment sessions with Sarah Seeley–Fellows, a licensed social worker. Seeley–Fellows found that Singfield refused to provide truthful answers about his family history concerning violence and criminal background. Singfield denies this, saying he refused to answer these questions because he believed his family and his family's criminal background were irrelevant to anger management. Seeley–Fellows decided to recommend that Singfield return to work without further counseling or assessments. Seeley–Fellows communicated her recommendation to Yuhasz. In response, Yuhasz raised concerns that Seeley–Fellows did not have enough information to make a complete assessment about Singfield's anger. The parties disagree about exactly what Yuhasz discussed with Seeley–Fellows.

The plaintiff alleges Yuhasz told Seeley–Fellows, several lies to influence her decision on whether Singfield was fit to return to work. The defendants offer a different version of events.[9] No matter what they

---

7. At Davis's deposition he testified (p. 56 & 78):

Tersigni (Defense Counsel): What happed after this meeting, this August 9th meeting? Davis. I believe Les (William Singfield) was suspended.... I'm not sure whether he did it or not, but he said something about lying down in the snow and waiting on the supervisor to come out, but he said that he— he either thought better of it or if he did—— his hands got so cold that he changed his mind or something like that.
Q. Laying in the snow with a gun?
A. Yeah
Q. All right. And that's what Les told you?
A. Yeah.

8. The text from the suspension letter read:

It is expected that you will participate in some type of treatment for anger management while serving your suspension. You will be required to provide proof of treatment in order to be permitted to return to work, and as a condition of employment. If the professional who helps you manage your anger feels that it will take longer than thirty days, your suspension will be extended until such time as he/she recommends your return to work.

9. Singfield argues that Yushasz told Seeley–Fellows several lies to induce her into not recommending Singfield for work release. These alleged lies include telling Seeley–Fellows that Singfield: 1) had only been suspended for two weeks, 2) had been escorted from AMHA on the day he was suspended by

said, Seeley–Fellows decided Singfield needed further assessment and referred Singfield to Dr. James Orlando for psychological testing. After two voluntary psychological tests and several counseling sessions with Dr. Frye, the psychologists diagnosed Singfield with Personality Disorder, Not Otherwise Specified. Dr. Frye sent a letter to AMHA dated November 7, 2001 stating, "...we believe that there continues to be a risk that his anger will lead to further, potentially explosive incidents." Dr. Frye continued, stating "I do not believe that he can safely return to work at this time."

After AMHA received Dr. Frye's letter, Singfield terminated his counseling with Summit Psychological. Singfield and O'Leary discussed his decision to end counseling at Summit Psychological. Singfield told O'Leary he had lost confidence in their services and believed that Yuhasz had provided false information about him. Executive Director O'Leary told Singfield that Singfield must complete the anger management counseling and receive a release recommendation, before he

could return to work. Singfield, thereafter, sought counseling from Gizelle Jones–Williams, a licensed social worker at Jewish Family Service. Singfield's attorney referred him to Jones–Williams.

AMHA continued its investigation into Singfield's conduct while he obtained counseling. O'Leary discussed the matter with both in-house counsel and outside legal counsel. Yuhasz had several meetings with employees concerning statements they made about Singfield's behavior. The investigation uncovered several serious anger management related events that occurred outside the work place.[10]

Near December 20, 2001, Social Worker Jones–Williams provided AMHA a treatment summary. Jones–Williams's summary indicated progress through counseling but did not give the opinion that Singfield could safely return to work. Despite repeated attempts by Singfield's counsel to get a work release giving the opinion that Singfield was able to safely return to work, Jones–Williams refused to provide it.[11]

---

armed Akron policemen, 3) several co-workers were afraid of Singfield, 4) Singfield tried to kill another employee, 5) Singfield's brother killed his father (Yushasz denies ever making this statement).

10. Singfield allegedly told three employees, Reinhart, Spurlock, and Davis that he laid in the snow outside his supervisor's home and waited to kill him, but was unable to do it because his hands were too cold to pull the trigger. Singfield allegedly told John Morris that the supervisor he had tried to kill was Allan Thomas.

Terry Foster reported that Singfield threatened to "punch someone in the jaw," during an AMHA team meeting.

Garrett Williams reported that while Singfield was living at AMHA housing, he got into an argument with another tenant and showed her a gun in his apartment as an implied threat.

A police report filed against Singfield alleged that he threatened his mother's fiance after her death saying, "you killed my mother and I will not rest until you are dead."

A police report filed against Singfield alleged that he verbally abused a teacher at his son's school yelling at her and calling her a "fucking bitch."

Several employees expressed fear about Singfield's return to work and asked if AMHA would provide bullet proof vests for employees when Singfield returned.

11. At Jones–Williams's deposition, she testified (p. 73 & 82–83):

Tersigni (Counsel for the Defendants): I notice in this letter you don't say that Mr. Singfield is able to return to work.
A. That's correct.
Q. Why does your letter not state that?
A. Because I do not— I do not make that statement about whether a client should or should not return to work.

When Singfield failed to obtain a medical opinion that he was fit to return to work, AMHA terminated Singfield's employment on January 25, 2002.[12] Singfield argues that AMHA unlawfully terminated him based on racially discriminatory reasons. Furthermore, Singfield believes AMHA and O'Leary violated his due process and equal protection rights. Finally, Singfield charges that AMHA fired him for retaliatory purposes after he filed a racial discrimination charge against AMHA on October 19, 2001.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Showing that there is some existence of doubt is not sufficient for the nonmoving party merely as to the material facts. *Id.*

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *National Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir.1997). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174, 178 (6th Cir.1996) (internal quotations omitted).

## III. Racial Discrimination Claims

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1994). In dispa-

Q. You never make that statement?
A. No, I don't.
Q. Why is that?
A. Because you can't clearly behavior is very hard to clearly state that someone is or is not going to do something while they're at work, so I just do not respond to that. I give them my assessment and I allow them to make the determination as to whether they should return to work or not.

. . . . .

Q. do you recall—- okay. At what point do you recall talking to Mr. Gilbert about giving Singfield a release to return to work.

A. It looks like on January 17, I explained my position that I will not write him a return-to-work. That's what it looks like.
Q. Did Gilbert expressly state that that's what he wanted you to provide, a return-to-work?
A. He said that the EEOC officer needed yeah, that he needed this return-to-work.
Q. And your position was what, what you've previously explained to me?
A. Yes, that I would not write that.

12. AMHA says the following factors played a role in deciding to terminate Singfield's employment: employee safety concerns, the disruption caused by Singfield in the workplace, and the lack of a return to work recommendation after four months on suspension.

rate treatment claims, such as Singfield's, the employer allegedly treats some people less favorably than others because of their race, color, religion, sex, or national origin. To make out a claim of disparate treatment, the claimant must prove a discriminatory motive, although it can in some situations be inferred from differences in treatment.

A plaintiff may establish a *prima facie* case under Title VII for racial discrimination by introducing direct evidence of discrimination or by using the *McDonnell Douglas* paradigm. *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997), *citing Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1248 (6th Cir.1995). The paradigm requires the plaintiff to show inferential and circumstantial evidence that a jury could use to draw an inference of discrimination. *Id.* When a plaintiff attempts to establish a *prima facie* case using inferential and circumstantial evidence, the plaintiff must show that he: (1) is a member of a protected group, (2) was subject to an adverse employment action, (3) was qualified for the position, and (4) he was treated differently than employees outside the protected class for the same or similar conduct. *Talley*, 61 F.3d at 1246, *citing Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). To make the showing that he was treated differently, the plaintiff must "show that the 'comparables' are similarly-situated in all respects." *Toledo Hosp.* at 582. In the Sixth Circuit, "the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [male] employees who [s]he alleges were treated more favorably." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994). The plaintiffs has the burden of establishing these factors. *Toledo Hosp.* at 582.

■ Singfield has also brought a race discrimination claim under Ohio Rev.Code Chapter 4112. Federal case law interpreting Title VII applies in determining whether employment practices have been discriminatory under Ohio Rev.Code Chapter 4112. *Hollowell v. Society Bank & Trust*, 78 Ohio App.3d 574, 581, 605 N.E.2d 954 (1992) (citations omitted).

1. Direct Evidence of Discrimination

■ The plaintiff claims he shows direct evidence of discrimination. After carefully examining the plaintiff's evidence, this Court finds no direct evidence of discrimination. Specifically, the plaintiff alleges that Singfield "received the dirtiest and hardest assignments while white employees were allowed to lounge, play cards and read the newspaper." Furthermore, the plaintiff asserts that Singfield "was forced to drive a lawn mower, instead of a truck," ... "unlike white employees." Finally, the plaintiff argues Reinhart made, "racially derogatory remarks," to him. Singfield says while he was riding on his tractor Reinhart made the comment, "now all you need is to turn the lights on and wear a straw hat."

First, Singfield provides no proof to support his allegation that he received dirtier and harder assignments than his white counterparts. Nor does Singfield provide any proof that he was forced to drive a tractor instead of a truck. A mere allegation without proof cannot serve as direct evidence. Secondly, the remarks that Singfield complains of, even if true, do not amount to direct evidence of racial discrimination. The Supreme Court pronounced that "simple teasing" or "offhand comments, and isolated incidents" do not amount to direct evidence of discrimination under Title VII. *Fara v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), *accord Hafford v.*

*Seidner,* 183 F.3d 506, 512–12 (6th Cir. 1999). Singfield makes no allegation or offers any proof that these comments were anything more than simple teasing. Additionally, the comments concerning driving a tractor are race neutral. The plaintiff makes no showing how these comments are connected to race. For these reasons, the Court finds no direct evidence of discrimination.

### 2. Indirect Evidence of Discrimination, *McDonnell–Douglas* Paradigm

This Court finds the plaintiff does not make a *prima facie* showing of racial discrimination claim under Title VII or the Ohio Rev.Code Chapter 4112 using the *McDonnell Douglas* paradigm. The plaintiff, as an African American, is a member of a protected class. The plaintiff was subject to an adverse employment action when AMHA terminated his employment. As to the third *McDonnell Douglas* prong, the defendants never contest whether the plaintiff was qualified for the position. However, the Court finds there could be a factual issue as to whether the plaintiff was qualified to work as a maintenance employee once the psychologist diagnosed him with personality disorder and refused to release him for continued employment. Never-the-less, the Court will assume the plaintiff meets prongs one through three. The Court will focus its analysis on prong four, the only prong contested by the defendants in their brief. (Def.'s Mem. Supp. Summ. J. at 13). The plaintiff fails to meet the fourth prong of the *McDonnell Douglas* test, which requires that he show that AMHA treated him differently than employees outside the protected class for the same or similar conduct.

■ Under *Mitchell,* the Sixth Circuit held that sharing the same supervisor and being subject to the same standards are not sufficient to establish that a non-minority employee is similarly situated. *See*

*generally, Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). Singfield must show that the non-minority employees "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Clayton v. Meijer, Inc.,* 281 F.3d 605, 611 (6th Cir.2002) (holding that Caucasian employees who engaged in the same act as the plaintiff, but it did not result in injury to others, were not "similarly situated.")

■ Singfield cannot show that AMHA treated him differently from similarly situated employees when they suspended him for having an altercation with his supervisor and possessing six duplicate master keys. The plaintiff argues that AMHA treated John Stock, a white employee different from him. Although Stock, is a non-minority employee, the Court finds that Stock was not similarly situated to Singfield. Stock worked as a janitor not as a maintenance worker. Furthermore, AMHA suspended Stock for three (3) days for duplicating without authorization, one master key that accessed an area where he worked. AMHA suspended Singfield for possessing six duplicate master keys and for his altercation with his supervisor. Furthermore, the duplicate master keys that Singfield's possessed, granted access to areas outside the areas where Singfield worked. Additionally, Stock had no prior disciplinary record, whereas AMHA had twice previously been suspended Singfield for misbehavior. Furthermore, Stock did not have an altercation with a supervisor. Therefore, Singfield cannot show that he and Stock were similarly situated.

■ Additionally, the plaintiff claims that AMHA treated Virgil Arnes, a white employee differently for similar offenses. Although Arnes is a non-minority employ-

ee, this Court finds that Arnes and Singfield are not similarly situated. AMHA gave Arnes a written reprimand for leaving a master key in his assigned vehicle over-night. Arnes's reprimand occurred ten (10) years before Singfield's suspension. At the time of Arnes suspension, AMHA had a different master key policy. Also, a different management team reprimanded Arnes. AMHA disciplined Singfield under a new master key policy that became effective in 1996, about five years after Arnes's reprimand. Arnes merely left one master key in an assigned vehicle as opposed to carrying around six duplicate master keys on a personal key ring. Furthermore, Arnes was not involved in an altercation with his supervisor. For these reasons, the Court finds Arnes and Singfield were not similarly situated nor where they disciplined for similar behavior.

■ Furthermore, the plaintiff alleges AMHA treated him differently than similarly situated non-minority employees when they terminated his employment for possessing six duplicate master keys and having an altercation with Reinhart. Responding, the Defendants say that they did not fire Singfield for violating the master key policy. Rather, they claim AMHA terminated Singfield because of anger management problems, problems reflected in previous outbursts, difficulties with supervisors and peers, and also shown by his inability to secure a work release saying he was fit for work.

In support of AMHA's position, the defendants show evidence that Singfield made threats of violence toward tenants and employees, attempted acts of violence, and intimidation toward employees, managers, and tenants. In response, Singfield argues that white employees engaged in similar conduct but were not terminated. However, Singfield fails to prove that these white employees were similarly situ-

ated. For example, Singfield presents the affidavit of AMHA employee Anthony Turner who says at an unspecified time, during a four-year period, he observed a fight between maintenance employees Ronald Feinman and Dan Caporuscio. Turner claims that Bob Spring, a former AMHA supervisor, witnessed the incident. However, Spring no longer works with AMHA and AMHA has no record of the fight ever occurring. Assuming the fight did occur, one altercation could hardly be comparable to Singfield's record of verbal abuse and threatening behavior.

■ Additionally, Singfield claims AMHA treated him differently than John Herrick. Herrick-allegedly made physical threats toward supervisor Pat Dolan during an AMHA Christmas party thirteen (13) years ago. Kevin Ray, an AMHA employee, discusses this event in an affidavit. However, Dolan himself testified that Herrick had never threatened him and he never had knowledge of this Christmas party threat. In fact, AHMA has no record that threat ever occurred. At that time, O'Leary, the Executive Director at the time of Singfield's discharge, did not hold that position. Furthermore, the plaintiff never asserts that Herrick worked as a maintenance employee. Even if Dolan's testimony that he had never been threatened is disregarded, this comparison fails because Herrick and Singfield were not similarly situated because any incident between Dolan and Herrick does not rise to the level of behavior in which Singfield allegedly engaged. Therefore, even if the threat occurred, Herrick and Singfield did not commit similar conduct.

■ Finally, Singfield argues that other white employees committed more serious offenses, but, AMHA did not treat them as harshly. Singfield argues that AMHA only suspended employee Mark Cook when he tested positive for marijuana us-

age. Furthermore, Singfield argues that AMHA did not terminate an employee Rainy, when he lost his license due to a D.U.I. conviction. First, neither of these employees are similarly situated to Singfield. The behavior that they allegedly committed is not comparable to Singfield's alleged behavior. Secondly, the plaintiff does not show evidence that these employees were maintenance workers.

For these reasons, the Court finds that the plaintiff fails to meet the fourth prong of the *prima facie* case for a race discrimination claim under Title VII and Ohio Rev.Code Chapter 4112. The Court grants the defendants' motion for summary judgment on these issues.

### 3. Legitimate Non–Discriminatory Reasons for Termination

Although the Court grants the defendants judgment because Singfield fails to show evidence of a *prima facie* case, the Court goes on to consider whether Singfield shows that AMHA's explanation is pretextual. If a plaintiff meets the *prima facie* requirement for a race discrimination claim under Title VII, then the burden shifts to the defendant to establish legitimate non-discriminatory reasons for its employment actions. *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant can articulate legitimate non-discriminatory reasons for the adverse employment action, then the burden shifts back to the employer to prove the stated reasons are pretexts for discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–5, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Supreme Court says plaintiffs can show pretexts by showing the employer's proffered reasons are unworthy of belief, or by showing that a discriminatory motive more likely motivated the employer's action. *Texas Dept. Comm. Affairs,* 450 U.S. at

253–254, 101 S.Ct. 1089. The ultimate burden of persuasion rests with the plaintiff. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ This Court has already found that the plaintiff failed to make a *prima facie* showing of racial discrimination. However, even if the plaintiff did meet the *prima facie* requirement, this Court finds that the defendant has presented numerous legitimate, non-discriminatory reasons for terminating the plaintiff. These factors when taken together, provide a justification for terminating the plaintiff. Additionally, the Court finds that the plaintiff has failed to show that these reasons for the plaintiff's termination are pretexts for racial discrimination. The defendants argue that O'Leary decided to terminate Singfield after evaluating the history of three suspensions for altercations with co-workers, tenants, and supervisors; Singfield's inability to get along with several supervisors; several employees' expression of fear for their safety if Singfield returned to work; Singfield's statement to at least three AMHA employees that he attempted to assassinate his supervisor; and a licensed Ph.D. psychologist's recommendation that it was unsafe for Singfield to return to work. The defendants argue that all these incidents taken together create a legitimate non-discriminatory justification to terminate Singfield.

■ The plaintiff responds by trying to dismantle each incident individually, spinning each in the best possible light for the plaintiff. However, the plaintiff fails to show these reasons for termination offered by the defendant are pretexts for racial discrimination. An employer is entitled to make a subjective judgment to discharge an employee for any non-discriminatory reason. *See e.g., Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 70

(6th Cir.1982). An employer's proffered non-discriminatory basis for its adverse employment action cannot be a pretext for discrimination if the employer honestly holds this belief. *Smith v. Chrysler Corp.,* 155 F.3d 799, 805–06 (6th Cir.1998). To establish that it honestly held justified reasons for terminating an employee, a defendant must establish its reasonable reliance on the particular facts that were before it at the time it made that decision. *Id.* at 807. In deciding whether the employer reasonably relied upon facts, a court does not require that the decisional process used by the employer be optimal or that it left no stone unturned. *Id., see also Snowden v. Proctor & Gamble Distributing Co.,* 14 Fed. Appx. 605 (6th Cir.2001). It is sufficient that the defendant made a reasonably informed and considered decision before taking an adverse employment action. *Snowden,* 14 Fed. Appx. at 609.

The defendant has shown that it took ample care investigating the facts regarding Singfield's possible termination, and made the decision based on a reasonably held belief. The defendant has shown that O'Leary, the sole decision maker regarding Singfield's termination, met with both outside and in-house legal counsel, gathered information from numerous employees and supervisors who worked with Singfield, review his employment history, and sought a recommendation from a licensed psychologist. The plaintiff has offered no real persuasive evidence to show that these proffered reasons for termination were pretexts for racial discrimination. In fact, most of the employees, tenants, and supervisors Singfield had altercations or anger problems with were also African American.

For these reasons, the Court finds that the defendants have offered legitimate non-discriminatory reasons for terminating Singfield. Additionally, the Court finds that the plaintiff has failed to show by a preponderance of the evidence that these reasons are pretexts for racial discrimination.

### IV. Retaliation Claim

In addition, Title VII makes it unlawful for an employer "to discriminate against any of his employees or applicants ... because he has opposed any practice, made an unlawful employment practice by this sub chapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this sub chapter." 42 U.S.C. § 2000e–3(a) (1994). In order to meet the *prima facie* standards for a retaliation claim, the plaintiff must establish that he: 1) engaged in activity protected by Title VII, 2) the exercise of his civil rights was known to the defendant, 3) the defendant subjected him to an adverse employment action, and 4) a causal connection exists between the protected activity and adverse employment action. *Allen v. Mich. Dept. of Corrections,* 165 F.3d 405, 412 (6th Cir.1999). To make out a claim of retaliation, the claimant must establish there was discrimination against an employee or applicant, and, second, the discrimination occurred because of the employee's opposition or participation conduct.

This Court finds that the plaintiff has established factors one, two, and three of the *prima facie* case for a retaliation claim, but fails to meet the fourth prong. The defendants concede that the plaintiff engaged in protected activity when he filed his October 2001, racial discrimination charge with the OCRC and EEOC. The defendants also concede they knew about the plaintiff's racial discrimination filing. Finally, the defendants' acknowledge they subjected the plaintiff to an adverse employment action when AMHA terminated the plaintiff. However, the plaintiff has

failed to present any evidence that a causal connection exists between the discrimination charge and his termination.

■■■■ To meet the fourth prong of a *prima facie* claim for retaliation, the plaintiff must show, "a causal connection between filing ... [the] civil rights lawsuit" and the adverse employment action taken against him. *Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). The burden of establishing a *prima facie* case in a retaliation case is not onerous, but easily met. *See Avery*, 104 F.3d at 861. However, the plaintiff needs to show more than "vague or generalized claims" of causation. *Allen*, 165 F.3d at 413. To show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that employer took the adverse action because the plaintiff filed a discrimination charge. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) (citations omitted). In *Allen*, the Sixth Circuit held the fact that a plaintiff could not show "any specific dates or incidents in which he was denied a promotion or treated differently from identically situated employees," as dispositive in showing a causal connection between an adverse employment action and exercising a protected right. *Id.* at 413.

The plaintiff argues that he has established causation because he has presented evidence to show that his termination was close in time to his filing of a discrimination charge. Singfield filed his discrimination charge in October 2001 and AMHA terminated him in January 2002. The plaintiff cites *Allen*, to support this argument. However, the plaintiff misrepresents the Sixth Circuit's holding in *Allen*. Actually, the Court held the fact that an "adverse action was taken shortly after the plaintiff's exercise of protected rights," was "relevant to causation ... *although no*

*one factor is dispositive ...*" *Id.* (emphasis added).

The plaintiff has failed to show any persuasive evidence other than close proximity in time to prove causation. This alone cannot establish causation. The plaintiff has failed to show any other evidence that could support an inference that his termination was based on a retaliation for filing a discrimination charge against AMHA. For these reasons, the Court grants summary judgment for the defendants on this issue.

### V. Due Process Claim

■■■■ Singfield claims that AMHA and Defendant O'Leary violated his constitutional right to due process. Singfield brings a cause of action under 42 U.S.C. § 1983. The right to due process of law is found in the Fourteenth Amendment to the United States Constitution. The Fourteenth Amendment in pertinent part prohibits States from depriving, "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In making his claim that AMHA and O'Leary violated his constitutional right to due process, Singfield must show that he had a property right in continued employment with AMHA. Once Singfield can establish that he enjoyed a property right to continued employment at AMHA, then he must prove that AMHA denied him "due process of law" before terminating his property right. The essential principle behind procedural due process is that deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), *see also Lee v. Western Reserve Psychiatric Habilitation Center*, 747 F.2d 1062, 1067 (6th Cir.1984).

■■■■ The Court finds that Defendants AMHA and O'Leary should receive sum-

mary judgment on the plaintiff's due process claims. First, Singfield has failed to show that he had a property interest in continued employment as a maintenance employee at AMHA. In *Loudermill*, the Supreme Court recognized a property right in continued employment for "classified civil service employees." *Loudermill*, 470 U.S. at 538–39, 105 S.Ct. 1487. The Ohio statute that creates this property interest states that "classified civil service employees" are entitled to retain their positions, "during good behavior and efficient service," and cannot be dismissed, "except ... for ... misfeasance, malfeasance, or nonfeasance in office."[13] Ohio Rev.Code § 124.34. Singfield, however, worked as an unclassified civil service employee. There are several differences between classified and unclassified civil service employees.[14] While in the position of maintenance employee, Singfield did not meet any of the classified civil service requirements.[15] The Sixth Circuit has held that unclassified civil service employees have no property right to continued employment. *Vodila v. Clelland*, 836 F.2d 231 (6th Cir.1987), accord *Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir.1995).

█ Singfield makes two arguments in support of his assertion that he possessed a property interest in his continued employment with AMHA. Singfield argues that he received a property right to continued employment through the language in the AMHA Employee Handbook and the contract AMHA entered into with the union. Second, Singfield argues that he obtained an implied property right in continued employment in exchange for seeking anger management from the terms of his suspension with AHMA. The plaintiff cites, *Ventetuolo v. Burke*, 470 F.Supp. 887 (D.R.I.1978), to support his second argument.

█ These arguments, however, do not persuade the Court. First, the AMHA Employee Handbook and union contract say that employees will not be terminated without cause and that a structured process will usually precede any employee termination. Assuming that the plaintiff obtained a right to due process from his union contract, the defendants satisfied all of the due process requirements under *Loudermill*. In discussing what process is required, the Supreme Court has said that the plaintiff should be given notice of the

---

**13.** The relevant portion of § 124.34 provides that no classified civil servant may be removed except "for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any acts of misfeasance, malfeasance, or nonfeasance in office."

**14.** (1) Applicants for classified positions are employed from eligibility lists and are required to demonstrate their fitness for employment through competitive examination or providing evidence that they satisfy specific requirements. *Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir.1995).(2) Classified civil servants have tenure during "good be-

havior and efficient service," and can be discharged only for cause as set forth in Ohio Rev.Code § 124.34, and have displacement or "bumping" rights in the event of job abolishment. *See Deryck v. Akron City School Dist.*, 633 F.Supp. 1180, 1182 (N.D.Ohio 1986), aff'd, 820 F.2d 405, 1987 WL 37610 (6th Cir.1987).(3) A classified civil servant has the right to appeal a layoff to State Personnel Board of Review within ten days after receipt of the notice of layoff. Ohio Rev.Code § 124.328.

**15.** AMHA did not hire Singfield through an eligibility list. Singfield did not take a pre-hire competitive exam. As a maintenance employee, Singfield did not have the right to displacement and could not appeal a layoff decision to the State Personnel Board of Review.

charges against him, an explanation of the employer's evidence, and a chance to present his side of the story. *Loudermill*, 470 U.S. at 532, 105 S.Ct. 1487. The notice and pre-termination hearing serve to ensure, "... there are reasonable grounds to believe that the charges against the employees are true and support the proposed action." *Duchesne v. Williams*, 849 F.2d 1004, 1007 (6th Cir.1988). Therefore, the pre-termination hearing does not require full evidentiary, adjudicatory hearing, which is the primary function of the post-termination hearing. *Id.* at 1006–07. AMHA gave Singfield notice of the charges against him and he had an opportunity to be heard. Yushaz met with Singfield and Davis twice. Yushaz gave Singfield an opportunity to address allegations pending against him. Additionally, his suspension letter, though not conclusive, is some evidence of notice. The Sixth Circuit has held, when a person faces charges that a reasonable person would recognize as jeopardizing an employment future, extra pre-termination due process obligations are not placed on the employer. *Buckner v. City of Highland Park*, 901 F.2d 491 (6th Cir.1990). This Court finds that even if the plaintiff had a right to a pre-termination hearing, the defendants met all due process obligations.

Finally, the defendants gave the plaintiff additional opportunities to be heard and to explain his side regarding the charges against him. The defendants held a Step 3 pre-termination hearing on February 13, 2002. Singfield received notice of this Step 3 grievance hearing, but did not attend. AMHA conducted the hearing in his absence. Furthermore, AMHA, under union rules, subsequently submitted the matter to arbitration on March 26—27, 2003. Singfield testified at this arbitration hearing and was represented by legal counsel. The arbitrator heard arguments concerning Singfield's grievances from his suspension and termination.

 The process due in any given circumstance entails a balancing of the governmental and private interests that are affected. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) Under *Mathews*, the specific dictates of due process generally require consideration of three distinct factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the [governmental] function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. 893 (*citing Goldberg v. Kelly*, 397 U.S. 254, 263–271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)).

 "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Instead, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) Flexibility in treatment is a necessary element of due process because "not all situations calling for procedural safeguards call for the same kind of procedure." *Ibid.*

In *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), the Court discussed the requirement for notice before a suspension without pay followed by a post suspension hearing: "[W]e specifically noted that we have rejected the proposition that [due process] always re-

quires the State to provide a hearing prior to the initial deprivation of property." *citing Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In balancing the interest involved, the Court found a pre-termination suspension without pay did not require a full hearing, *Id.* at 931, 117 S.Ct. 1807.

In *Buckner*, the employer offered the employee an opportunity to comment on the allegations against him in front of a union representative, however the employee refused. 901 F.2d 491. The employer terminated the employee and then held a post-termination hearing pursuant to the union's collective bargaining agreement. *Id.* The employee later claimed his due process rights had been violated. *Id.* The Sixth Circuit disagreed, finding that the employee's due process rights were met given his opportunity to speak in front of the union representative and particularly in light of the elaborate post-termination hearing. *Id.* The Sixth Circuit held that the critical element to the *Loudermill* requirements is the right to be heard and respond to the employer's evidence. *Id.* The employer need not tell the employee he will be fired unless he presents evidence contrary to the employer's charges against him. *Id.*

Here, the defendants gave the plaintiff at least three opportunities to be heard and to address charges against him. Additionally, the defendants conducted an elaborate post-termination hearing where the counsel represented the plaintiff before a neutral arbitrator. Under the Supreme Court's holding in *Gilbert*, and the Sixth Circuit's reasoning in *Buckner*, this Court finds that Singfield's due process right were met.

Second, the Court finds no authority to support the plaintiff's second argument. In fact *Ventetuolo*, which is not binding on this Court, deals with pre-employment promises rather than an alleged promise to continue employment if certain terms of a suspension are met. *Ventetuolo*, 470 F.Supp. at 892. Even so, the *Ventetuolo* court found that these pre-employment promises did not amount to a property right for continued employment. *Id.* at 893. Additionally, the plaintiff makes another argument that the defendants violated his constitutional right to due process with respect to liberty and property, exclusive of race. The plaintiff contends it was a denial of due process to terminate Singfield based on rumors and lies. For the same reasons incorporated above, this argument fails to persuade.

For these reasons, the Court grants summary judgment for AMHA and Defendant O'Leary on the due process claims.

### VI. Equal Protection Claim

 Singfield has claimed that AMHA and O'Leary violated his constitutional right to equal protection. Singfield finds a cause of action under 42 U.S.C. § 1983. The equal protection clause of the Fourteenth Amendment provides that no State shall deny to any person within its jurisdiction the equal protection of the laws. *See* U.S. Const. Amend. XIV, § 1. To state a claim under the equal protection clause of the Fourteenth Amendment through § 1983, a plaintiff alleging discrimination must allege that a state actor intentionally discriminated against him because of his membership in a protected class. *Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 341 (6th Cir.1990). A claim under the equal protection clause requires a plaintiff to prove the same *prima facie* elements as a disparate treatment claim under Title VII. *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir.1988). The plaintiff has failed to put forth any new arguments for his equal protection claims. Rather, he relies on the reasoning of his Title VII claims to carry over to the equal

protection arguments. Therefore, the Court grants summary judgment for the defendants on the equal protection claims for the same reasons it grants summary judgment on the Title VII claims.

### VII. Constitutional Claims Against O'Leary

■ This Court finds that both the due process and equal protection claims against O'Leary must fail. However, even if the defendants were not entitled to summary judgment, Defendant O'Leary is entitled to qualified immunity from civil suits for damages on these claims. It is well settled that government officials who perform discretionary functions are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties unless their alleged conduct violated clearly established constitutional rights of which a reasonable person would have known. *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir.1994). The Supreme Court has held that qualified immunity protects, "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley,* the Supreme Court held that a police officer who "reasonably believed" probable cause was present could not be held liable for damages for an equal protection claim. *Id.* at 344–45, 106 S.Ct. 1092. Given the laundry list of circumstances involving Singfield's confrontations and alleged assassination attempt combined with the psychologist's refusal to clear him for work, its clear that O'Leary had a basis for a reasonable belief Singfield's termination was justified. The plaintiff has failed to present any evidence of intentional discrimination or malice. Therefore, O'Leary is entitled to qualified immunity from liability for both the due process and equal protection claims.

### VIII. Conclusion

For these reasons the Court grants summary judgment for the defendants. The plaintiff's claims are hereby dismissed.

IT IS SO ORDERED.

### ORDER

On March 10, 2003, Defendants Akron Metropolitan Housing Authority ("AMHA") and Anthony W. O'Leary ("O'Leary") moved this Court for summary judgment in the above captioned matter. Plaintiff William Singfield ("Singfield") opposes this motion. After considering the facts and applicable law, this Court grants the defendants' motion for summary judgment.

This Court has issued a Memorandum Order in the above captioned matter. Accordingly, this action is terminated under Fed.R.Civ.P. 58.

IT IS SO ORDERED.